FILED
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

July 20, 2015

Blaine F. Bates
Clerk

PUBLISH

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

| | |
|---|---|
| IN RE EXPERT SOUTH TULSA, LLC, <br><br> Debtor. | BAP No.    KS-14-027 |
| EXPERT SOUTH TULSA, LLC, <br><br>        Plaintiff – Appellant, <br><br>  and <br><br> E.H. HAWES REVOCABLE TRUST <br><br>        Intervenor-Plaintiff – <br>        Appellant, <br><br>   v. <br><br> CORNERSTONE CREEK PARTNERS, LLC, <br><br>        Defendant – Appellee. | Bankr. No.  10-20982 <br> Adv. No.    11-06208 <br> Chapter    11 <br><br><br><br> OPINION |

Appeal from the United States Bankruptcy Court
for the District of Kansas

Eric L. Johnson of Spencer Fane Britt & Browne LLP (Andrea M. Chase of Spencer Fane Britt & Browne LLP and Jonathan A. Margolies of McDowell, Rice, Smith & Buchanan PC, with him on the briefs), Kansas City, Missouri, for Plaintiff – Appellant Expert South Tulsa, LLC and Intervenor-Plaintiff-Appellant E.H. Hawes Revocable Trust.

John Henry Rule of GableGotwals (Sidney K. Swinson and Brandon C. Bickle of GableGotwals and John W. McClelland of Armstrong Teasdale, LLP, Kansas City, Missouri with him on the brief), Tulsa, Oklahoma, for Defendant – Appellee Cornerstone Creek Partners, LLC.

Before THURMAN, Chief Judge, MICHAEL, and ROMERO, Bankruptcy Judges.

THURMAN, Chief Judge.

In this appeal, both the debtor, Expert South Tulsa, LLC ("EST"), and the E.H. Hawes Revocable Trust (the "Trust")[1] challenge the bankruptcy court's order granting Cornerstone Creek Partners, LLC ("Cornerstone")'s motion for summary judgment in the appellants' fraudulent transfer claim against it. We affirm.

I.    BACKGROUND

The basic facts are simple. EST sold real property (the "Commons") to Cornerstone in January 2010 for $3 million. Approximately ten days later, Cornerstone sold the Commons to South Memorial Development Group, LLC ("South Memorial") for approximately $4.42 million. An involuntary Chapter 7 petition was filed against EST on March 30, 2010, which EST later had converted to a Chapter 11. On September 1, 2011, EST[2] filed an adversary action against Cornerstone, pursuant to 11 U.S.C. § 548(a)(1)(B) (the "§ 548 Claim") and § 544(b), asserting a claim under Oklahoma's Uniform Fraudulent Transfer Act (the "UFTA Claim").[3] The complaint sought to avoid EST's sale of the Commons to Cornerstone on the grounds that EST was insolvent at the time of the sale and Cornerstone had not provided "reasonably equivalent value" for the property.

The first prong of the adversary claim, insolvency, is uncontested on appeal. However, the parties disagree on the second prong, *i.e.*, regarding the value that was given and received for the Commons. Nonetheless, the bankruptcy

---

[1]    The Trust is technically a creditor of EST, but it is a revocable trust settled by the father of one of EST's two principals.

[2]    The adversary was initially brought by EST, but the Trust, which is a creditor of EST, later intervened.

[3]    Oklahoma's Uniform Fraudulent Transfer Act, Okla. Stat. Ann. tit. 24, §§ 112-123, will hereafter in this opinion be called the "UFTA" or the "Act."

court found that the uncontroverted facts established that EST could not prevail on its § 548 Claim because it had received reasonably equivalent value for the sale. The bankruptcy court also ruled, as a matter of law, that EST could not prevail on its UFTA Claim because the Commons was not an "asset" subject to that Act, as it was fully encumbered at the time of the sale.[4]

The details of the challenged sale transaction are quite complex, and EST relies heavily on that complexity in an effort to establish contested issues of fact.[5] The principals of EST are Lawrence McLellan ("McLellan") and Trey Hawes ("Hawes"). The Trust is an inter-vivos revocable inheritance device settled by Hawes' father, and is a creditor of EST. The Trust periodically advanced money to EST and other entities owned by McLellan and Hawes, but the total amount of those advancements is a contested issue. McLellan and Hawes were also the principals of three other limited liability companies, Expert Owasso, LLC ("Owasso"), which owned approximately 2.57 acres of property in Owasso, Oklahoma, Expert SWC Rockwell Memorial, LLC ("Rockwell"), which owned approximately 41 acres of property in Oklahoma City, Oklahoma, and Expert Development, LLC ("Development"), which was the manager of EST, Owasso, and Rockwell.[6]

---

[4]     "Asset" is a statutorily defined term in this context. Clearly, the Commons was an asset for balance statement purposes. However, the UFTA excludes a debtor's property from its definition of an "asset," to which fraudulent transfer restrictions are applicable, "to the extent it is encumbered by a valid lien." Okla. Stat. Ann. tit. 24, § 113(2)(a) (1986).

[5]     For example, EST contests many extraneous facts, and has also apparently included every document filed in the bankruptcy court in the appellate record. As a result, both the relevant facts and documents are more difficult to find than they probably should be. Especially since it is only "material" fact disputes that preclude summary judgment rulings. Fed. R. Civ. P. 56(a).

[6]     EST, Owasso, Rockwell, and Development will at times be referred to in this opinion as the "Expert LLCs."

EST was formed to purchase and develop real property located in South Tulsa, Oklahoma (the "Tulsa Property"), and it obtained a loan to purchase and develop the Tulsa Property from M&I Marshall & IIsley Bank ("M&I") in early 2007. That loan (the "Tulsa Loan") was secured by the Tulsa Property, a $12,329,500 promissory note (the "Note"), and the personal guaranties of McLellan and Hawes. The Note was renewed, modified, and/or transferred many times. EST purchased the Tulsa Property for $10.3 million, and then divided it into three separate parcels: 1) an 11-acre parcel that was sold, pre-petition, to Life Time Fitness; 2) a 2.5-acre parcel, also sold pre-petition to an individual buyer for construction of a hotel; and 3) the Commons, a 21.5-acre parcel that is the subject of the present dispute.

In 2008, EST sold the first two of the three Tulsa Property parcels, using the proceeds of those sales to pay M&I approximately $2.5 million on the Tulsa Loan. EST and M&I were in the process of negotiating a restructure of the Tulsa Loan, which was in default. Ultimately, the parties were unable to reach an agreement, and M&I elected to sell the Tulsa Loan at auction. The Tulsa Loan (along with some loans M&I had made to the other Expert LLCs) was purchased at auction by OKL 18, LLC ("OKL") in March 2009. At all times relevant to this appeal, the principals of OKL were Steve Perry ("Perry") and Scott Asner ("Asner").

Shortly after OKL purchased the Expert LLC loans, including the Tulsa Loan, the Expert LLCs (including EST) entered into a forbearance agreement (the "Forbearance Agreement") with OKL. In the Forbearance Agreement, OKL agreed to cease collection efforts on the purchased loans until July 22, 2009, upon its receipt of a $500,000 forbearance fee. In addition, the Forbearance Agreement provided that a payment of $5.5 million (plus accrued interest) to OKL by July 22, 2009 would fully satisfy the obligations of the debtors and the guarantors on

the Expert LLC loans. Payment to OKL of $1 million would extend the forbearance period to September 20, 2009.

The $500,000 forbearance fee was paid by the Expert LLCs with funding provided by the Trust. On July 23, 2009, as no additional payments had been made by the Expert LLCs, OKL declared the Forbearance Agreement to be terminated, and requested full payment of all Expert loans. On the same day, Owasso and Rockwell executed a new forbearance agreement with OKL, which related only to loans of those LLCs, for which they paid $100,000. The new forbearance agreement allowed Owasso and Rockwell to eliminate their loans by paying $4.25 million to OKL by August 5, 2009. Although this forbearance agreement was extended twice, it also terminated pursuant to its terms due to Owasso and Rockwell's failure to pay the agreed satisfaction amount.

In August 2009, OKL filed a state court action against EST, seeking both to recover on the Note and to foreclose its lien on the Commons. At that time, a state court mechanic's lien action was already pending against EST, and the new foreclosure action was consolidated with that case. While the Tulsa Loan was in default, McLellan and Hawes discussed with OKL (via Perry) the potential for the Trust to purchase the Tulsa Loan.[7] As a result, OKL and the Trust reached an agreement, executed on November 9, 2009, that gave the Trust an option to purchase the Tulsa Loan (the "Trust Option").[8] Under the Trust Option, the Tulsa Loan could be purchased by the Trust for approximately $1.65 million, plus interest and costs, but only if that amount was paid to OKL on or before December 31, 2009. The Trust Option included the following provisions:

---

[7] Apparently, although the Trust was technically a creditor of EST, Hawes acted on the Trust's behalf, at least in this transaction.

[8] Because EST was not a party to the Option, the Trust intervened as a plaintiff in the adversary proceeding against OKL.

1. <u>Grant of Option</u>. Lender [OKL] does hereby grant to Purchaser [the Trust] the option (the "Option") to purchase the Tulsa Loan at a purchase price of $1,645,108 as of the date of this Agreement plus: (a) if the Option is exercised after the date hereof but on or before November 30, 2009, an additional amount equal to $1,519.45 per diem, and (b) if the Option is exercised on or after December 1, 2009 but on or before December 31, 2009, an additional amount equal to $2,019.45 per diem in addition to the amount payable pursuant to the preceding subparagraph (a), and (c) an additional amount equal to all legal fees, costs and expenses incurred by Lender with respect to the Tulsa Loan through the date of the exercise of the Option (collectively, the "Option Price").

2. <u>Exercise of Option</u>. Purchaser may exercise the Option by paying the Option Price in full to Lender on or before December 31, 2009, 2 p.m. Kansas City, Missouri time.

3. <u>Closing Documents</u>. Upon payment of the Option Price, Lender (contemporaneous with such funding) shall provide (I) an Assignment of Loan Documents, (ii) an Assignment of Mortgage (in recordable form), (iii) an allonge to the original promissory note(s) for the Tulsa Loan and (iv) any and all other reasonable documents customary for a loan conveyance. Purchaser acknowledges and agrees that Lender is making no representations or warranties of any kind in connection with the sale and assignment of the Tulsa Loan, including but not limited to the outstanding principal balance thereof or interest accrued and payable thereon, and that such sale and assignment shall be without recourse to Lender.

8. <u>Amendment</u>. The provisions of this Agreement may be amended or waived only by an instrument in writing signed by the parties hereto.

11. <u>No Oral Agreements</u>. The Parties each acknowledge that the other Party has no obligation except as set forth herein and that it is not relying on any agreement, representation or warranty of the other Party in entering into this Agreement, other than the agreements of such Party expressly and specifically set forth in this Agreement.

12. <u>Time is of Essence</u>. Time is of the essence of each and every covenant, condition and provision of this Agreement to be performed by the parties hereto.[9]

Throughout the negotiations with OKL, EST was attempting to sell the Commons. On December 11, 2009, EST and Sitton Properties, LLC ("Sitton LLC") entered into a purchase contract, under which Sitton LLC agreed to buy

---

[9]   Option to Purchase Promissory Note and Related Loan Documents *in* Joint Appendix of Appellants Expert South Tulsa, LLC and E.H. Hawes Revocable Trust, vol. 10 ("Appx 10") at 2589-591.

the Commons for $3.2 million (the "Sitton Contract"). The principal of Sitton LLC was Mike Sitton ("Sitton"). As part of the Sitton Contract, EST agreed to take ownership of certain Tulsa real property that was owned by Sitton LLC (the "Riverside Property"). The sale to Sitton was originally set to close by February 11, 2010, but the Sitton Contract was modified to shorten the closing period to December 30, 2009.[10]

Eighteen days later, on the day before the closing deadline for the Sitton Contract, EST was informed that Sitton LLC had assigned its interest in the Sitton Contract to South Memorial, and that South Memorial would not be bound by the December 30 closing date. Moreover, if EST insisted on closing the sale by December 30, South Memorial would terminate the Sitton Contract. The next day, December 30, South Memorial terminated the Sitton Contract. EST continued trying to secure a sale of the Commons throughout that day and the next. On December 31, OKL assigned its interest in the Tulsa Loan to GTMI, LLC ("GTMI"), apparently for tax reasons. Despite the assignment, EST continued to discuss the Tulsa Loan and the Trust Option with Perry, who acted as the lender representative. The assignment of the Tulsa Loan mortgage to GTMI was not recorded, nor did GTMI substitute for OKL in the pending foreclosure action.

Also on December 31, Hawes notified Perry by email that a new sale had been negotiated with Sitton and his partner, Rob Phillips ("Phillips"). On that basis, Hawes requested that the Trust Option be extended to January 8, 2010. Perry responded by email, "I will let you know as soon as I can get an answer." No further contact was had until Perry notified Hawes on January 5 that he was

---

[10]    This change was apparently intended to allow use of the sale proceeds to pay OKL the $1.65 million purchase price for the Tulsa Loan by December 31. However, although sale of the Commons was between EST and Sitton LLC, the Trust Option was between OKL and the Trust.

"still waiting for final sign off," and proffered an amended payoff amount "if funds are received prior to 2 p.m. this Friday [1/8]. I need to see a draft settlement statement from the title company [re Sitton/Phillips purchase] ASAP so I can get final sign off on my end. After Friday, no deal." Also on January 5, EST's counsel was notified that the Sitton Contract would be assigned to Cornerstone[11] and would be amended to both reflect a purchase price of $3 million and exclude the Riverside Property.[12] The next day, January 6, Perry notified Hawes by email that Cornerstone would be ready to close on January 8.

Cornerstone and EST executed a new contract for the purchase and sale of the Commons (the "Cornerstone Contract"), specifying a purchase price of $3 million, to be paid on January 8, and including a representation by EST that there would be no pending or threatened claims against the property, except as may be provided in the title commitment. Thus, EST was required to deliver clean title to Cornerstone, and was required to obtain dismissal of the pending foreclosure action as a condition to issuance of a title policy.[13]

At the closing on January 8, 2010, Cornerstone paid $3 million to the title company, from which it made the following payments:

- $1,742,170.16 to GTMI (as holder of the Tulsa Loan);
- $17,002.42 to OKL for its legal fees;
- $114,999.77 to mechanic's lien holders for lien releases;

---

[11]    Cornerstone was formed as a limited liability company by counsel for OKL and GTMI for the purpose of acquiring and developing the Commons. Phillips signed the sale agreement on behalf of Cornerstone.

[12]    The Sitton Contract had already been terminated by South Memorial on December 30. However, Sitton and Phillips continued to push EST to take ownership of the Riverside Property, which was apparently transferred to EST sometime after the January 8 sale to Cornerstone.

[13]    It should be noted that the Trust never held any secured interest in the Tulsa Property.

- $15,000 to Paisley Properties, LLLP ("Paisley");[14]

- $686,000 to EST's unsecured creditors (including EST's attorney's fees of $42,500, and $415,000 to the Trust); and

- $137,330 in miscellaneous closing costs.

The $415,000 paid to the Trust was credited by it to EST's outstanding debt. The remainder of the $3 million purchase price, a total of $261,477, was paid directly to EST, which subsequently paid it to Sitton LLC for the Riverside Property.

On January 27, 2010, only nineteen days after the EST/Cornerstone sale closing, Cornerstone closed its own sale of the Commons to South Memorial.[15] The purchase price under the Cornerstone/South Memorial sale contract was $4,421,230.[16]

Team Viva, LLC, an EST creditor, filed an involuntary Chapter 7 petition against EST on March 30, 2010, which case was later converted to Chapter 11 at EST's request. EST filed the adversary proceeding from which this appeal arose in September 2011, seeking to recover approximately $1.42 million from Cornerstone pursuant to either Oklahoma law (through § 544(b)) or § 548(a)(1)(B). Cornerstone moved for summary judgment on EST's complaint, which was ultimately granted by the bankruptcy court. For purposes of summary judgment, the parties agreed that the value of the Commons at the time of its sale to Cornerstone was $4.99 million.

---

[14] Paisley held an undivided 5% interest in the Commons as a tenant-in-common.

[15] South Memorial had previously purchased the Sitton Contract and then revoked it when EST would not agree to extend the closing date past December 31, 2009.

[16] This Court has no information regarding the reason why South Memorial, which had been unwilling to purchase the subject property for $3.2 million if the sale had to close by December 30, was willing to buy the same property at a 44% higher price less than one month later.

## II.    APPELLATE JURISDICTION

This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[17]  A decision is considered final "if it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'"[18]  An order granting summary judgment disposing of the plaintiff's claims against the defendant is a final order for purposes of appeal.[19]  The bankruptcy court order granting summary judgment to Cornerstone was entered on June 9, 2014, and EST and the Trust filed a notice of appeal from that order on June 23, 2014.  The notice of appeal was therefore timely.[20]

At the same time, appellants also filed a Rule 9023 motion to alter or amend the bankruptcy court's judgment, purportedly to resolve any problems with the judgment that might be caused by the United States Supreme Court's June 9, 2014 *Executive Benefits* decision.[21]  The parties and the bankruptcy court agreed to an order granting appellants' motion and to entry of an amended memorandum

---

[17]    28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr. P. 8001(e) (*now also at* Fed. R. Bankr. P. 8005, effective December 1, 2014); 10th Cir. BAP L.R. 8001-3 (*now at* 10th Cir. BAP L.R. 8005-1, effective December 1, 2014).

[18]    *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712 (1996) (quoting *Catlin v. United States*, 324 U.S. 229, 233 (1945)).

[19]    *Tanner v. Barber (In re Barber)*, 326 B.R. 463, 466 (10th Cir. BAP 2005) (order granting summary judgment disposed of adversary proceeding and was final and appealable).

[20]    Fed. R. Bankr. P. 8002(a)(1) (notice of appeal must be filed within fourteen days of entry of final order).

[21]    *Executive Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165 (2014) (setting parameters of bankruptcy courts' non-core jurisdiction).  Rule 9023 of the federal bankruptcy rules makes Rule 59 of the Federal Rules of Civil Procedure applicable to bankruptcy cases.  We see no different result under the Supreme Court's more recent case on this issue, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015).

decision, *nunc pro tunc*, specifically finding that the parties had consented to the bankruptcy court hearing and determination of the adversary proceeding, pursuant to 28 U.S.C. § 157(c)(2).[22]

Neither the appellants nor the appellee elected to have this appeal heard by the district court, and the parties have therefore consented to appellate review by this Court.[23]

### III. ISSUES AND STANDARDS OF REVIEW

1. **Did the bankruptcy court properly determine, as a matter of law, that the Commons was not an "asset" and, therefore, not subject to avoidance under the UFTA?**

2. **Did the bankruptcy court properly determine, as a matter of law, that EST received "reasonably equivalent value" for the Commons from Cornerstone, such that the sale was not subject to avoidance under 11 U.S.C. § 548(a)(1)(B)?[24]**

Both of these issues arise from a decision on summary judgment. Such judgments are reviewed by this Court *de novo*, applying the same legal standard as was used by the bankruptcy court.[25] *De novo* review requires an independent determination of the issues, giving no special weight to the bankruptcy court's decision.[26]

---

[22] Whether the appeal time runs from entry of the order granting appellants' Rule 9023 motion or from either order granting summary judgment, the notice of appeal filed on June 23, 2014 was timely. *See* Fed. R. Bankr. P. 8002(b)(2) and 9023.

[23] 28 U.S.C. § 158(c)(1); Fed. R. Bankr. P. 8001(e) (*now also at* Fed. R. Bankr. P. 8005, effective December 1, 2014).

[24] Unless otherwise indicated, all further statutory references in this decision will be to the Bankruptcy Code, which is Title 11 of the United States Code.

[25] *Rushton v. Bank of Utah (In re C.W. Min. Co.)*, 477 B.R. 176, 180 (10th Cir. BAP 2012), *aff'd*, 749 F.3d 895 (10th Cir. 2014).

[26] *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).

IV.    DISCUSSION

   A.    Summary Judgment Standard

The appealed order was decided as a matter of summary judgment.

Summary judgment is appropriate only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any," when

viewed in the light most favorable to the non-moving party, "show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."[27]  A dispute about a material fact is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the non-moving

party.[28]  In making its determination, the court must draw all justifiable inferences

in favor of the non-moving party.[29]  "Statutory interpretation is a matter of law

appropriate for resolution on summary judgment."[30]

   B.    Applicability of the UFTA

Section 544(b)(1) of the Bankruptcy Code (the "strong-arm statute") allows

a trustee (or a debtor-in-possession)[31] to avoid transfers of the debtor's property

that would be voidable by an unsecured creditor pursuant to applicable state law.

This provision makes state fraudulent transfer laws applicable in bankruptcy.

Oklahoma law applies to the EST/Cornerstone sale, and Oklahoma has adopted

the UFTA.  That Act describes a "fraudulent transfer" as follows:

---

[27]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (internal quotations omitted); Fed. R. Civ. P. 56(a) (made applicable to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7056)).

[28]    *Anderson,* 477 U.S. at 248.

[29]    *Id.* at 255.

[30]    *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011).

[31]    Although §§ 544 and 548 grant avoidance power only to the bankruptcy trustee, a debtor-in-possession is given the trustee's power to avoid transfers by § 1107(a).  *Se. Waffles, LLC v. United States Dep't of Treasury (In re Se. Waffles, LLC)*, 702 F.3d 850, 856 n.3 (6th Cir. 2012) (debtor-in-possession has trustee's avoidance powers).

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.[32]

Significantly, the UFTA avoidance power is only available when the property "transfer" was of a debtor's "asset." The Act defines those terms, as follows:

"Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with *an asset or an interest in an asset*, and includes payment of money, release, lease, and creation of a lien or other encumbrance.

"Asset" means property of a debtor, but the term does not include . . . property to the extent it is encumbered by a valid lien.[33]

The UFTA also provides that it "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among states enacting it."[34]

EST's position is that the bankruptcy court erroneously determined that the Commons was not an "asset" at the time of its sale to Cornerstone because it was fully secured and, therefore, not subject to the UFTA. EST does not contest that real properties subject to liens equal to or in excess of their value are not "assets" subject to the UFTA.[35] Rather, relying almost entirely on a Connecticut UFTA

---

[32] Okla. Stat. Ann. tit. 24, § 117 (1986).

[33] Okla. Stat. Ann. tit. 24, § 113(2)(a) and (12) (1986) (emphasis added).

[34] Okla. Stat. Ann. tit. 24, § 123 (1986). Thus, courts in states that have adopted the UFTA typically consider other states' interpretations of the Act's language when construing the Act's provisions. *See, e.g., Brown v. ARP & Hammond Hardware Co.*, 141 P.3d 673, 680 (Wyo. 2006) (decisions of other courts are persuasive with respect to uniform or model acts).

[35] *See, e.g., Noranda Aluminum, Inc. v. Golden Aluminum Extrusion, LLC*, No. M2013-02274-COA-R3-CV, 2014 WL 4803149, at *6 (Tenn. Ct. App. Sept. 26, 2014) ("property encumbered by a lien is excluded from the UFTA's definition of an asset to the extent of the encumbrance"); *Jecker v. Hidden Valley, Inc.*, 27 A.3d 964, 971 (N.J. Super. Ct. App. Div. 2011) (transfer of fully encumbered property is not subject to the UFTA); *In re Valente*, 360 F.3d 256,

(continued...)

decision, *World Properties*,[36] EST contends that the value of the Commons actually exceeded the liens on it at the time of the Cornerstone sale. Accordingly, a careful review of the *World Properties* decision is in order.

In *World Properties* an unsecured creditor filed an action to avoid its debtor's transfer of real property to a related entity, claiming the transfer to be fraudulent under the UFTA. One of the defendants, Antonio Reale, was a contractor/developer who controlled several business entities primarily owned by his wife and children. Three Reale businesses were World Properties, World, and LAN. World had no assets and did not conduct business, as it was used primarily to funnel funds between other Reale companies and Reale's wife, who had neither income nor creditors. However, LAN and Reale owned real property in New Jersey that was subject to a mortgage held by the FDIC. The FDIC foreclosed the mortgage on the New Jersey property in 1994, but that property was of insufficient value to satisfy the mortgage, resulting in an award to the FDIC of a $7 million deficiency judgment against LAN and Reale. The FDIC later transferred the deficiency judgment to National.

LAN also borrowed money from Chase Bank in order to develop real property in Enfield, Connecticut (the "Property"), giving Chase a mortgage on the Property as security for the loan. LAN defaulted on that mortgage, which led to foreclosure of Chase's mortgage in 1995, from which Chase obtained a $17 million judgment against LAN and Reale. Around the same time, LAN managed to lease the Enfield property, on which a 113,000 square foot building had been constructed, to a supermarket chain. The lease terms favored the lessor such that, with the lease, the property value increased to $14.5 million.

---

[35] (...continued)
260 (1st Cir. 2004) (over-encumbered real property is not "asset" under UFTA).

[36] *Nat'l Loan Investors, L.P. v. World Props., LLC*, 830 A.2d 1178 (Conn. App. Ct. 2003).

-14-

Once the lease was in place, Reale reached an agreement with WLL, Chase's successor-in-interest to the foreclosure judgment, under which WLL accepted payment of $5.2 million "in full satisfaction of the debt."  LAN and Reale obtained a mortgage loan from People's Bank in order to fund the payment to WLL.  People's Bank was directed to pay the loan proceeds to World Properties, an entity that Reale had recently formed, which then paid the $5.2 million settlement amount to WLL.  In return, according to the defendants, World Properties received the $17 million Chase judgment, which it proceeded to foreclose.  In response, LAN transferred both the property and the lease to World Properties, which left it without any assets and, thus, no ability to pay the FDIC/National deficiency judgment from the year before.

Predictably, National filed suit against LAN, World Properties, World, and Reale, alleging that LAN's transfer to World Properties was fraudulent under the UFTA.  The trial court agreed, and entered judgment avoiding the World Properties transfer.  Defendants appealed, asserting that the property was not an "asset" subject to a transfer avoidance under the UFTA because it was secured by the Chase/National/World Properties $17 million judgment lien, which exceeded the property's value, when it was transferred.  All parties and the court agreed that a transfer of property subject to liens that equaled or exceeded its value would not be subject to avoidance under the UFTA.  The defendants' claim was rejected by the trial court, which was affirmed by the Connecticut Court of Appeals, based on a finding that the property had not been subject to a $17 million lien when it was transferred because the defendants' settlement with WLL had discharged that lien and substituted the $5.2 million lien in its stead, and "[t]hat settlement occurred *prior to the transfer* between LAN and World."[37]

_____

[37]    *Id.* at 733 (emphasis added).  Although the appellate court mistakenly stated that the Property was transferred to World rather than to the actual

(continued...)

The property transferor in *World Properties* unsuccessfully argued that its transfer of property to a related company could not be avoided as a fraudulent transfer because the transferee held a lien on the property that exceeded the property's value. In the present case, relying on *World Properties*, EST seeks to avoid its own transfer of property to an unrelated company, claiming that a lien exceeding the property's value was compromised prior to the transfer, leaving the property with some equity and, therefore, an "asset" subject to the UFTA.[38] However, EST misconstrues the applicability of *World Properties* to this appeal. Here, as in *World Properties*, the property transferor attempts to manipulate applicability of the UFTA to its advantage, using a "friendly" separate entity as the means to either avoid or ratify a property transfer. Such a result is most certainly not supported by the *World Properties* decision, in which the court determined that such conduct would not be sanctioned.

The essence of the *World Properties* decision is that a security interest that is compromised *prior to* transfer of the secured property will be included in a determination of the property's security status at the compromised value. However, the undisputed facts in the present appeal establish that no such compromise took place prior to the Cornerstone sale closing. The present transaction was, effectively, a "short sale." Such sales are common and involve an agreement by a property lien holder to accept less than full repayment of its loan in exchange for its full release of a property lien in order to facilitate a sale of the secured property. Short sales typically involve mortgage obligations that are in default, and lenders enter into such agreements based on the economic

---

[37]     (...continued)
transferee, World Properties, that misstatement did not affect its analysis.

[38]     This position is somewhat contrary to EST's second appellate argument, which is that the lien was transferred to the Trust, and thus it was error to include a lien reduction in the value obtained by EST for the transfer.

reality that the certainty of partial repayment from sale proceeds is usually preferable to an uncertain recovery from foreclosure and resale.[39]

Short sales are often preceded by lenders' attempts to either sell the loan to another lender at a discount or to rewrite the mortgage terms with the borrower. If such an agreement is reached without involving the property's sale, the parties' conduct will thereafter be dictated by the terms of the new agreement. In *World Properties*, the trial court found that just such a compromise agreement had been made prior to any transfer of the property by the debtor. Thus, when the debtor did transfer the property, it was subject only to the compromised mortgage and had value beyond the security. As such, the property was an "asset" that debtor could only transfer in exchange for "reasonably equivalent value" under the UFTA. Debtor's receipt of less than equivalent value for the property led the Connecticut court to avoid the sale.

In the present case, however, although OKL had indicated its willingness to accept less than full value for the Tulsa Loan, either from the debtor or from a third party, no compromise deal was ever consummated prior to the sale of the Commons to Cornerstone. In fact, the Trust did not make any payment to either OKL or GTMI after it paid to obtain the Trust Option. The only payments that were made to those entities came directly from EST's sale proceeds. Thus, the Trust undeniably did not exercise the Trust Option prior to the Cornerstone sale closing, whether or not its time to do so had been extended.

Appellants respond that the parties' communications leading up to the sale at least create a disputed issue of fact as to whether the Trust Option had been extended prior to the sale, and thus requiring a denial of the motion for summary judgment and a reversal by this Court. Indeed, whether or not OKL and/or GTMI

---

[39]     Significantly, such debt reductions then become part of the "value" the seller receives from the sale, which is an issue that will be discussed in the section of this opinion dealing with "reasonably equivalent value."

extended the Trust Option's payment deadline was and is a hotly contested matter between these parties. However, only "material" fact disputes preclude entry of summary judgment, and resolving that dispute in appellants' favor does not change the result since, whether or not the Trust was granted additional time to exercise the option, it did not do so. Moreover, even if the Trust did somehow exercise the option, it did not do so prior to the Cornerstone sale. Therefore, "at the time of the sale," the Commons was subject to a $7.75 million mortgage that exceeded its value, which means it was not an "asset" under the UFTA and its transfer to Cornerstone was not subject to avoidance under that Act.

### C.     Reasonably Equivalent Value

EST asserted avoidance claims under both the UFTA and § 548(a)(1)(B). These two fraudulent transfer provisions are essentially identical, except that § 548 does not require transfer of an "asset," as does the UFTA. Instead, § 548 covers transfers of "an interest of the debtor in property" or the incurrence by the debtor of "an obligation" that are not in exchange for "reasonably equivalent value."

> The relevant portions of § 548 provide:
>
> (a)(1) The trustee [or the debtor in possession] may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
> (B)(I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

This provision allows a property transfer that was made within the two-year period immediately preceding the petition filing to be avoided, but only if the plaintiff establishes both that the transfer was not supported by debtor's receipt of "reasonably equivalent value" and that the transfer took place when the debtor was insolvent (or the debtor became insolvent due to the transfer). Such transfers

are considered "constructively fraudulent,"[40] and are avoidable on behalf of the estate's unsecured creditors.

In seeking to avoid the Cornerstone sale, EST claims, in essence, that Cornerstone (and, by implication, OKL) took advantage of its foundering financial situation to profit from a back-to-back purchase and resale of the Commons. Considering only the following basic facts of the sale and the resale, EST's assertion may appear to be well-taken:

> EST agreed to sell the Commons to Sitton LLC for a purchase price of $3.2 million. Prior to closing, Sitton LLC inexplicably transferred its interest in the sale agreement to South Memorial. South Memorial then canceled the sale, purportedly over the closing date. EST returned to negotiations with the Sitton LLC principals and worked out a "new" deal on the same terms, but with a slightly later closing date. EST was then told that its deal with the Sitton LLC principals would be executed by Cornerstone rather than Sitton, and that the purchase price would be $3 million, rather than the previously agreed-upon $3.2 million. The deal closed, on time and for a price of $3 million. Almost immediately thereafter, Cornerstone (which was apparently set up by the Sitton LLC principals for the sole purpose of buying and selling the Commons) resold the property to South Memorial (EST's original buyer) for $4.4 million.

However, the issue before the bankruptcy court and this Court is not the validity of the resale transaction. It is simply whether EST received "reasonably equivalent value" in exchange for its transfer of the Commons to Cornerstone.

Although "reasonably equivalent value" is not defined in the Bankruptcy Code, it is not a simple calculation of purchase price versus the property's appraised value.[41] If it were, then payment of $3 million for a property worth

---

[40]   *Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.)*, 84 F.3d 1286, 1287 (10th Cir. 1996) (§ 548(a)(2) claim defined as "constructive fraudulent" transfer); *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 510 B.R. 342, 352 (10th Cir. BAP 2014) (same).

[41]   *LTF Real Estate Co. v. Expert S. Tulsa, LLC (In re Expert S. Tulsa, LLC)*, 522 B.R. 634, 652 (10th Cir. BAP 2014) (reasonably equivalent value determination involves three questions: "(1) whether value was given; (2) if value was given, whether it was given in exchange for the transfer; and (3) whether what was transferred was reasonably equivalent to what was received"). *See also*

(continued...)

$4.99 million would certainly fail to meet the standard. Rather, reasonably

equivalent value is measured by all benefits received by the seller, direct and

indirect:

> The authorities are in agreement that Congress did not provide a definition reasonably equivalent value ("REV") in the federal bankruptcy statutes. Thus, the courts have been left with the responsibility of defining the term. A review of the case law reveals four precepts in construing REV. First, the fair market value of the property in question cannot usually be used as the sole determinant, especially in foreclosure actions. Second, although not wholly determinative, the market value of the property at issue is an important query and will often serve as a starting point for deciding whether REV was received by the debtor. Third, the property at issue must be disposed of in a manner consistent with the law of the forum state. Finally, a bankruptcy court should consider all of the facts of each case, one of which may be the market value of the property.[42]

Determination of reasonably equivalent value is ordinarily a finding of fact.[43]

However, where the facts of the transaction are undisputed, the issue presented is

whether or not those facts fit within the statutory parameters, which is an issue of

law.[44] Finally, the party seeking to avoid the transfer bears the burden of proving

---

[41] (...continued)
11 U.S.C. § 548(d)(2) (defining "value" to include satisfaction of present or antecedent debt of the debtor); *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1341 (10th Cir. 1996) (since "value" includes satisfaction of existing debt, the amount of debt that is satisfied must be included in determining reasonably equivalent value); *Parks v. Persels & Assocs., LLC (In re Kinderknecht)*, 470 B.R. 149, 170 (Bankr. D. Kan. 2012) (reasonably equivalent value is determined at the time of the transfer and is viewed from the standpoint of the debtor's creditors).

[42] *McCanna v. Burke*, 197 B.R. 333, 338-39 (D. N.M. 1996) (citations omitted).

[43] *See, e.g., Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 510 B.R. 342, 354 (10th Cir. BAP 2014) (the determination of reasonably equivalent value is largely a question of fact).

[44] *United States v. Telluride Co.*, 146 F.3d 1241, 1244 (10th Cir.1998) (construction and applicability of federal statutes reviewed de novo).

that reasonably equivalent value was *not* received.[45]

A determination of whether a transfer involved the exchange of reasonably equivalent value requires consideration of whether or not the transferor's unsecured creditors were better off before or after the transfer. In other words, courts must calculate the net value received from a transaction, and include any benefit received by the transferor, regardless of its source.[46] The bankruptcy court's determination of value received by EST in exchange for the Commons included the following amounts: 1) the $3 million purchase price paid by Cornerstone; 2) satisfaction of the Tulsa Loan promissory note and release of the mortgage, totaling $7,754,151;[47] and 3) releases of mechanic's liens that totaled $499,740.[48]

---

[45]    *In re Kinderknecht*, 470 B.R. at 169.

[46]    *See*, *e.g.*, *Sharp v. Chase Manhattan Bank, USA, N.A. (In re Commercial Fin. Servs., Inc.)*, 350 B.R. 559, 577-78 (Bankr. N.D. Okla. 2005) (*citing Harman v. First American Bank (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir.1992) and Jack F. Williams, "Revisiting the Proper Limits of Fraudulent Transfer Law," 8 Bankr. Dev. J. 55, 80 (1991)).

[47]    Since the purchase price was used to pay GTMI (the owner of the Tulsa Loan at the time of the Cornerstone closing) $1.74 million and OKL $17,000 (for its attorney's fees), the value received by EST from satisfaction of its Tulsa Loan obligation would necessarily be reduced by those amounts. Even so, since the loan reduction provided a net benefit of nearly $6 million, adding that amount to the $3 million purchase price results in a net gain of approximately $9 million.

[48]    The net benefit from the mechanic's lien releases may have been overstated. Approximately $500,000 in mechanic's liens were removed from the property for payment of approximately $115,000 out of the purchase price, for a net return of $385,000. However, since EST no longer owned the property after the transfer, lien releases arguably only benefitted it to the extent that the sale was dependent upon them. Although the Cornerstone sale clearly did depend on providing a clean title, it would be difficult to quantify the benefit to EST. On the other hand, to the extent that the lien releases were also full satisfactions of the underlying claims, EST would benefit, but only to the extent that the claim released exceeded the payment made to the lien holder. It appears that many of the lien releases were also satisfactions of the lien holders' claims. However, the largest lien claim was made by the general contractor, and that release does not appear to resolve the underlying claim. In light of these issues, this Court does not include a value for the mechanic's lien releases in its consideration of reasonably equivalent value.

Appellants, however, contend that the only value EST received in exchange from the sale was the $3 million purchase price, based on its claim that the Tulsa Loan was not discharged in that transaction but was instead transferred to the Trust. Under appellants' version of the transaction, then, EST remains obligated on the Tulsa Loan.[49] At the very least, appellants argue, there are disputed issues of material fact regarding the value received, which should have precluded summary judgment.

We disagree. First, it is undisputed that the Trust never paid the option amount, and thus never obtained the loan.[50] A lender may grant an option to purchase a loan, but the loan remains owed to the lender unless and until the option is exercised. In this case, the option was not exercised by the Trust, whether or not it was granted an extension of the time it had to do so. At closing, as part of a global transaction, OKL/GTMI accepted payment of $1.74 million in full satisfaction of the loan. The transaction documents made it clear that the

_____

[49] We note that such a transaction would ordinarily require the Trust to pay the amount requested by the lender, for which it would receive an assignment of the full $7.75 million promissory note obligation. However, in this case, it was actually EST that paid that amount, and it would be entitled to a credit on the note in the amount of that payment, leaving the Trust with a $6 million unsecured claim against it. However, appellants also claim, with respect to the property's status as an "asset, that the Tulsa Loan was compromised prior to the Cornerstone sale. If, as Cornerstone, OKL, and GTMI all claim, the payment at closing was in "full satisfaction" of the Tulsa Loan, then there was nothing left to transfer to the Trust. Likewise, if the loan was reduced from $7.75 million to $1.74 million by agreement with the lender, the Trust would still have no claim on the note because EST had already paid that amount. In response to these issues, appellants contend that only the loan security was compromised prior to the sale, leaving an unsecured obligation for the full amount of the note. This allows appellants to argue: 1) the property had value that exceeded the liens to which it was subject when it was transferred, so the UFTA is applicable, and 2) since compromise of the security without also compromising the underlying obligation doesn't benefit the property seller and, therefore, should not be considered in the "reasonably equivalent value" determination. This argument requires EST to put the Trust's interests ahead of the interests of all of its other unsecured creditors; which certainly does not appear to be a legitimate use of the § 548 avoidance power.

[50] Not only did the Trust not pay the money it now claims entitles it to recover the loan amount from EST's bankruptcy estate, it actually was paid $415,000 from the sale proceeds.

loan was being extinguished rather than transferred, and appellants were privy to all of the sale documentation. There is simply no other way to interpret the phrase "in full satisfaction" than as a full extinguishment of the debt, notwithstanding appellants' assertion that they did not interpret the transaction that way. Ironically, it is the lender that claims the debt was extinguished in the transaction, while the debtor contends that it was not.

Significantly, whatever any of the parties may have believed to be the effect of the sale transaction on the Tulsa Loan was rendered moot by OKL's filing of a dismissal with prejudice of the foreclosure action. OKL had asserted two causes of action in that lawsuit – one for recovery of the debt evidenced by the promissory note, and the other for foreclosure of the mortgage. Dismissal with prejudice of the claim on the note rendered that note unenforceable by anyone.[51] Moreover, Oklahoma law allows a plaintiff to dismiss its action without a court order prior to a pretrial hearing, and such dismissal may be expressly "with prejudice."[52] Finally, Oklahoma law also allowed OKL to continue as the plaintiff in the foreclosure action, despite its transfer of the Tulsa

---

[51] *See, e.g., Perfect Invs., Inc. v. Underwriters at Lloyd's*, 782 P.2d 932, 933 (Okla. 1989) (dismissal with prejudice operates as a bar to future action on the claim). Appellants contend that the fact that the promissory note was never marked as cancelled and is now in possession of the Trust renders it still enforceable. However, § 3-601 of the Uniform Commercial Code (Okla. Stat. tit. 12A, § 3-601) allows negotiable instruments to be discharged "by an act or agreement" with the obligor, and that discharge is effective unless the instrument is acquired by a "holder in due course." The Trust cannot be a holder in due course because it had notice that the note was compromised in connection with the Cornerstone sale. *See* Okla. Stat. tit. 12A, § 3-302, defining "holder in due course."

[52] Okla. Stat. tit. 12, § 684(A) provides: "An action may be dismissed by the plaintiff without an order of court by filing a notice of dismissal at any time before pretrial. After the pretrial hearing, an action may only be dismissed by agreement of the parties or by the court. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice." In this case, in addition to being prior to the pretrial, the parties (OKL and EST) did in fact agree to the dismissal, as part of the Cornerstone sale.

Loan to GTMI.[53]  Thus, the dismissal with prejudice of the foreclosure action was a bar to any further action on either the promissory note or the mortgage, effectively and permanently eliminating any claim of liability against EST based on the Tulsa Loan.

V.   CONCLUSION

The undisputed facts lead inevitably to the legal conclusion that the Cornerstone sale may not be avoided as constructively fraudulent under either the UFTA or § 548.  Accordingly, in the absence of disputes regarding material fact issues, this Court affirms the bankruptcy court's summary judgment.

---

[53]   Okla. Stat. tit. 12, § 2025(C): "In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party."