FILED
United States Court of Appeals
Tenth Circuit

July 22, 2025

Christopher M. Wolpert
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

In re: THEODORE WILLIAM
WHITE, JR.; PORSCHA SHIROMA,

    Debtors.

-----------------------------

J. KEVIN BIRD, Chapter 7 Trustee,

    Plaintiff - Appellant,

v.                                                          No. 24-4033

LYNN E. WARDLEY,

    Defendant - Appellee.

_____

**Appeal from the Bankruptcy Appellate Panel**
**(BAP No. 22-008-UT)**
_____

Adam S. Affleck of Richards Brandt Miller Nelson, Salt Lake City, Utah, for
Plaintiff-Appellant.

Troy J. Aramburu (Bret R. Evans, with him on the brief) of Snell & Wilmer
L.L.P., Salt Lake City, Utah, for Defendant-Appellee.
_____

Before **HARTZ**, **MORITZ**, and **ROSSMAN**, Circuit Judges.
_____

**ROSSMAN**, Circuit Judge.
_____

This appeal stems from a Chapter 7 bankruptcy case involving debtors Theodore William White, Jr., and Porscha Shiroma.[1] Several years before the Chapter 7 case began, White and Appellee Lynn E. Wardley had started a business that did not work out as planned. The Trustee in the Chapter 7 case—the Appellant before this court—initiated an adversary proceeding against Wardley under federal bankruptcy statutes and the Utah Uniform Fraudulent Transfer Act (UFTA). *See* 11 U.S.C. §§ 544, 550; Utah Code Ann. § 25-6-203 (West 2025). He alleged, and sought to avoid, a constructively fraudulent obligation and transfer made by White to Wardley in connection with their failed venture. The United States Bankruptcy Court for the District of Utah—on motions for summary judgment—rejected the Trustee's claims. The Trustee then sought review by the Tenth Circuit Bankruptcy Appellate Panel (BAP).[2] The BAP agreed with the bankruptcy court. And now, so do we. Exercising jurisdiction under 28 U.S.C. § 158(d)(1), we affirm the bankruptcy court's summary judgment orders in full.

---

[1] White and Shiroma are spouses. All events relevant to this appeal involve only White, not Shiroma.

[2] The BAP opinion on review is not in the record on appeal, but it is attached to the Trustee's opening brief. We therefore cite the BAP decision using the pagination in the opinion document itself (*e.g.*, BAP Op. at 1). But we cite the underlying bankruptcy court orders, and all other documents in the record, using the pagination in the record on appeal (*e.g.*, RI.1).

**I**[3]

**A**

White owned and operated several businesses engaged in marketing and selling discount medical insurance cards.[4] Through that experience, he "had developed marketing strategies and owned domain names and software." RXI.1416.

---

[3] We take the facts from the bankruptcy court's two summary judgment orders on review. The historical facts underlying this appeal, as the bankruptcy court summarized them, are uncontested, except as we specifically note.

[4] The Trustee's reply brief suggests the bankruptcy court was wrong to find, as an undisputed fact, White "had prior experience in setting up and running a supplemental insurance card company" because "neither the Trustee nor Wardley asserted such fact in their memoranda" at summary judgment. Reply Br. at 3 n.2 (quoting RXI.1416). We generally decline to reach issues raised for the first time in reply briefs. *Hill* v. *Kemp*, 478 F.3d 1236, 1250 (10th Cir. 2007) ("It is our general rule . . . that arguments and issues presented at such a late stage are waived."). In any event, the parties agreed White had owned and run supplemental insurance card companies, despite some initial confusion over precisely which ones. *See* RXI.1379–80.

The Trustee insists more generally "the bankruptcy court did not abide" the correct standards for reciting uncontested facts at summary judgment. Reply Br. at 2. We cannot reject the bankruptcy court's conclusions absent more specifics about where the court went astray. *See United States* v. *Martinez*, 92 F.4th 1213, 1265 (10th Cir. 2024) ("Our law is clear: 'The first task of an appellant is to explain to us why the [bankruptcy] court's decision was wrong.'" (quoting *Nixon* v. *City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015))); *Butler* v. *Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1145 (10th Cir. 2023) (finding "bald assertions" of error constitute inadequate briefing and result in waiver).

In early 2010, White sought an investor for these companies to avoid needing to shut them down. He approached Wardley, seeking a $4 million capital investment. Wardley declined that request, but he and White struck a different deal. They reached an oral agreement in late 2010, the terms of which are undisputed:

- They would form a new company, ABC Club LLC (ABC), to sell supplemental insurance cards;

- Wardley would loan money to ABC, and White would guarantee the loans, up to $750,000;

- White would secure the guaranty with part of his interest in a separate $15.5 million judgment;[5]

- Wardley would receive an 85% interest, and White would receive a 15% interest, in ABC; and

- ABC would employ White at an executive level and pay him a salary.

When he was deposed in this case, White testified he agreed to this deal because he expected ABC would "be worth . . . millions of dollars." RXI.1417. White also testified he expected to "run the company, sell millions of cards, and get my 15 percent, and be paid a salary." RXI.1417. Based on their agreement,

---

[5] White had a $15 million judgment from the City of Lee's Summit, Missouri owing to an unrelated lawsuit, which had grown to $15.5 million by the time it was paid.

4

Wardley began to advance funds to ABC in December 2010, and White started running the business's day-to-day affairs. They registered the company as an LLC in Nevada on December 6, 2010, and its first ledger entry came that same month.

In April 2011, White and Wardley—along with a third co-owner, C. David Hester—executed an Operating Agreement, backdated to ABC's date of incorporation, which essentially memorialized the terms of their oral agreement. Several provisions of the Operating Agreement are important to highlight.

- *Under Article 6.1*, ownership interests in ABC were assigned: 82% to Wardley, 15% to White, and 3% to Hester.[6] That article also provides the co-owners would contribute a proportional share of $1,000 to ABC: $820, $150, and $30, respectively.

- *Under Article 6.5*, White would receive $1 for each of the first 250,000 cards sold, and Wardley, in his discretion, could extend that incentive payment for an additional 250,000 cards.

- *Under Article 6.7*, White made "an irrevocable and unconditional promise[] to pay" up to $750,000 of the money loaned by Wardley, according to these terms, which we will later discuss:

---

[6] By this point, Wardley had transferred three percentage points of his original 85% stake to Hester. Hester is otherwise not relevant to this appeal.

5

The Members acknowledge that Lynn Wardley has lent and may, in his discretion, lend cash to the Company. The Members anticipate that the Company will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to the Company with interest thereon at the agreed rate. Further, Ted White acknowledges the personal benefit Mr. Wardley's organization and capitalization of the Company has provided to Mr. White in the form of his employment by and promotional ownership interest in the Company. Accordingly, Mr. White hereby personally guarantees the repayment of the full amount of Mr. Wardley's loans, up to $750,000.00, such that to the extent the Company's cash distributions to Mr. Wardley during the first twelve (12) months of the Company's operations (commencing with the first commercial shipment of the card) do not total the amount owed on the loans he has made, Mr. White shall pay Mr. Wardley personally the shortfall. This is an irrevocable and unconditional promise[] to pay and not a guarantee of the Company's performance. The calculation of any amount for which Mr. White may be liable to Mr. Wardley shall be made by the Company's accountant at the time the Company ceases operations and dissolves. Mr. White holds a judgment in litigation captioned [caption provided]. Mr. White hereby partially assigns his interest in such judgment to Mr. Wardley to secure the foregoing personal guaranty, and shall cause his attorneys in that litigation . . . to confirm such judgment and acknowledge this partial assignment and agree to distribute such sum upon demand from net proceeds payable to Mr. White from amounts collected on such judgment . . . in satisfaction of such personal guarantee.

RVIII.895–96.

White and Wardley signed two other documents the same day as the Operating Agreement.

6

*First*, they executed an Executive Employment Agreement. Wardley signed it as the company's manager. As relevant here, that agreement provided:

- ABC would employ White "to provide executive services in charge of product development and marketing," RVIII.899;

- ABC "may" pay White a salary "in an amount and at a frequency as determined by the Manager of the Company"—*i.e.*, Wardley—"in his sole discretion," RVIII.900; and

- White's employment could continue indefinitely, as long as he met "minimum performance levels," RVIII.900.

The Executive Employment Agreement did not set a specific salary for White. But the bankruptcy court found—and no party contests—Wardley and White agreed the salary would be at least $20,000 a month. *See* RXI.1420 (observing White testified "I was working for ABC Club taking a draw on something I had to pay back dollar for dollar at [$]20,000 a month" (alteration in original)); RXI.1427 (finding "the Debtor would be employed as the executive for ABC Club with compensation of $20,000 a month"); RXI.1431 (finding "the parties . . . agreed that the Debtor would run the company and receive a salary of $20,000 per month"); RXI.1437 (finding "[t]he Debtor mitigated his risk by taking charge of business operations and paying himself a salary of $20,000 per month"). From January to September 2011, the record shows White

7

ultimately received $235,000 in compensation, an average of more than $26,000 per month.

*Second*, White and Wardley signed an Incentive Agreement. There, Wardley "evidence[d] in writing [his] agreement to provide [White] additional incentives for" promoting ABC's success. RVIII.904. If ABC sold 1 million cards within twelve months of the company's first commercial card shipment, Wardley agreed to transfer five percentage points of his equity stake in ABC to White. He would transfer a total of ten percentage points if ABC sold 1.8 million cards within eighteen months of that first shipment.

Between December 16, 2010, and July 8, 2011, Wardley loaned $868,000 to fund ABC.[7] Wardley's loans provided ABC most of its funds, including for White's salary. Wardley testified in a deposition, "[A]ny monies that I forwarded to ABC . . . Ted White guaranteed or I wouldn't have forwarded them in my mind." RXI.1392.

In July 2011, after White gained access to his separate $15.5 million judgment, he wired $750,000 of it to Wardley to pay off the debt incurred through the personal guaranty. Wardley continued lending money to ABC even after White's $750,000 transfer, reaching more than $1.2 million in total loans.

---

[7] Because the Operating Agreement's plain text confirms White guaranteed these loans only up to $750,000, the loans and interest over that amount were never his responsibility and are not at issue. No party argues otherwise.

In September 2011, Wardley notified White he would no longer loan money for White's salary, but Wardley kept lending money for other purposes. White then stopped working for ABC. ABC's operations ceased altogether around November 2012. Ultimately, ABC sold either very few or no supplemental insurance cards. As of August 2013, ABC had amassed assets of about $6,000, negative net equity of about $287,000, and negative net income of about $1,287,000.

## B

### 1

In May 2014, White voluntarily filed for Chapter 7 bankruptcy protection. Two years later, pursuant to 11 U.S.C. §§ 544(b)(1) and 550, the Trustee commenced an adversary proceeding against Wardley. He alleged claims under the UFTA. *See* Utah Code Ann. § 25-6-203.[8] The relevant section provides,

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if:

---

[8] Since the Trustee commenced this action, the Utah Code has been renumbered. Some of the materials in the record on appeal reflect the code's prior numbering, but this opinion follows the current numbering. Apart from the renumbering, the relevant sections have not changed since this action began.

> (a) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
>
> (b) the debtor was insolvent at the time or became insolvent as a result of the transfer or obligation.

*Id.* § 25-6-203(1). As we will discuss, only subsection (a)—a lack of reasonably equivalent value received in exchange for the transfer or obligation—is at issue in this appeal. *See id.* § 25-6-203(1)(a).

In the operative amended complaint, the Trustee sought to recover the $750,000 White had paid Wardley to satisfy the guaranty.[9] The Trustee alleged those funds were recoverable in two ways.

*First*, White's promise to repay Wardley was avoidable as a constructively fraudulent obligation because White incurred it without receiving reasonably equivalent value in exchange (the Guaranty Claim). The Trustee's basic theory was White agreed to incur a sizeable debt without receiving much in return for making that promise. That hurt White's unsecured creditors by decreasing the size of White's estate, so the Trustee—standing in the shoes of those creditors via 11 U.S.C. § 544(b)—should have been able to avoid the guaranty obligation. As the bankruptcy court explained,

---

[9] The amended complaint also sought to recover *another* $750,000 White had arranged to be wired to Wardley—before the transfer at issue here—in satisfaction of certain personal loans and other unrelated debts. That other $750,000 is not at issue on appeal, so we do not address it further.

"If the Trustee can avoid the guaranty, he may be able to avoid the $750,000 transfer made in satisfaction of the guaranty." RXI.1414.

*Second*, White's actual payment of $750,000 to Wardley to satisfy the obligation was avoidable as a constructively fraudulent transfer because it, too, lacked reasonably equivalent value (the Transfer Claim). The Transfer Claim was premised on the idea that, under the Operating Agreement's plain terms, the promise to pay "was contingent, and the contingencies had not been satisfied" when White paid Wardley. RI.15. In the Trustee's view, transferring $750,000 to pay down a debt that was not actually then due, and may never have come due, conferred well less than $750,000 in value, meaning White's estate was again diminished to his unsecured creditors' detriment.

Soon after the Trustee filed his complaint, discovery began. White and Wardley were both deposed, and discovery continued for almost a year. The parties then commenced summary judgment proceedings.

**2**

In November 2017, Wardley moved for summary judgment on the Trustee's claims. He contended the UFTA claims failed as a matter of law because White received reasonably equivalent value in exchange for undertaking the guaranty obligation and for making the $750,000 transfer to satisfy it.

11

As to the Guaranty Claim, Wardley contended, in exchange for undertaking the guaranty, White received a 15% equity stake in ABC, an employment opportunity, and a business opportunity through the chance to run ABC. Those benefits were enough, he argued, to "avoid[] any harm to creditors" by conferring reasonably equivalent value on White in return for the guaranty. RII.44 (quoting *Rupp* v. *Moffo*, 358 P.3d 1060, 1064 (Utah 2015)). On the Transfer Claim, Wardley argued "there were no conditions precedent to White's obligations under the Operating Agreement." RII.51. The transfer thus reduced an antecedent debt and did so dollar for dollar. In other words, the payment to Wardley (losing $750,000 but gaining that amount in debt reduction) meant White's estate was unaffected. Thus, Wardley argued, "White received reasonably equivalent value in exchange for the . . . $750,000 Transfer as a matter of law." RII.53.

After a hearing, the bankruptcy court granted Wardley's motion for summary judgment in part. The court focused only on the Transfer Claim. The court did not rule on the Guaranty Claim but assumed, for purposes of the motion, that the guaranty obligation was "not avoidable," leaving a full

analysis of that claim for a future day. RV.693.[10] The court found the relevant historical facts were undisputed.

In analyzing the Transfer Claim, the bankruptcy court considered whether the guaranty obligation in the Operating Agreement created an antecedent debt under the UFTA, "meaning[ whether] Wardley ha[d] a legally cognizable[] state-law claim against White for payment under the Guaranty." RV.698. Relying on the unambiguous terms of the Operating Agreement, the bankruptcy court held "the nature of the Guaranty created immediate and direct liability in White without regard to the performance of ABC." RV.699. That means when White paid $750,000 to Wardley, White received reasonably, even perfectly, equivalent value for paying off his debt in full. The bankruptcy court therefore granted summary judgment to Wardley on the Transfer Claim.

**3**

In May 2021, the Trustee moved for summary judgment on the Guaranty Claim. According to the Trustee, the benefits to White from guaranteeing repayment of Wardley's loans flowed to him only indirectly, through ABC. Under these circumstances, the Trustee insisted Wardley had to establish White received reasonably equivalent value in exchange for the $750,000

---

[10] It is unclear why the bankruptcy court thought the Guaranty Claim was not then properly before it. There is no question it was one of the claims raised in Wardley's motion for summary judgment. *See* RII.48–51. But no court has flagged this as an issue and no party raises that ambiguity on appeal.

13

obligation he incurred, and the Trustee insisted Wardley had failed to satisfy his burden.[11] The Trustee further argued, even if the "burden to prove the absence of reasonably equivalent value" was on the Trustee, he could make that showing on the "undisputed facts" in the record. RVII.851.

In his opposition, Wardley asked the bankruptcy court to deny the Trustee's motion and "instead grant summary judgment in [his] favor" on the Guaranty Claim. RX.1200. Wardley did not separately move for summary judgment. According to Wardley, "the totality of the circumstances" revealed White received the above-described categories of benefits—namely, the 15% equity stake in ABC, an employment opportunity, and a business opportunity through the chance to run ABC—"*directly*," so the Trustee's effort to shift the burden should be rejected. RX.1223. He then specifically addressed those benefit categories, arguing their value reasonably equaled the obligation White incurred.

In September 2021, the bankruptcy court again ruled for Wardley—this time on the Guaranty Claim. The court "focus[ed] on what property and rights

---

[11] As we will discuss, the Trustee invoked the so-called indirect-benefit rule, which generally provides, "Once the plaintiff [or bankruptcy trustee] makes a *prima facie* showing that no sufficient direct benefit was received in the transaction, it is the defendants' burden to prove sufficient benefit that is tangible and concrete." Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning and Exemptions* § 2:29 (2024) (alteration in original) (quoting *Cooper v. Centar Investments (Asia) Ltd (In re Trigem Am. Corp.)*, 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010)).

were transferred to [White] and the value of such property and rights at the time of the Guaranty in December 2020." RXI.1426. Rejecting the Trustee's contrary arguments, the bankruptcy court found White had received his benefits directly, not indirectly. It further found "that at the time of the transaction, [White] received reasonably equivalent value in exchange for agreeing to guaranty up to $750,000 of [Wardley's] future loans." RXI.1415. The court therefore denied summary judgment for the Trustee and granted summary judgment to Wardley on the Guaranty Claim.

In sum, then, the bankruptcy court had at this point concluded:

- White received reasonably equivalent value for taking on the unconditional personal obligation to repay Wardley's loans up to $750,000. Thus, the guaranty was not avoidable.

- White received reasonably equivalent value for paying the $750,000 debt he owed under the guaranty obligation. Thus, the transfer was not recoverable.

That sufficed to reject both of the Trustee's claims under the UFTA, so the bankruptcy court entered final judgment for Wardley.

**4**

The Trustee appealed to the BAP in May 2022, and in February 2024, the BAP affirmed. The BAP concluded White had received reasonably equivalent value for both the guaranty obligation and the $750,000 transfer.

15

The BAP's reasoning closely mirrored that of the bankruptcy court. On the Guaranty Claim, the BAP endorsed the bankruptcy court's conclusion that, in exchange for the guaranty, "White received value in the form of opportunity to fund his start-up company, a salary amounting to $235,000 over a nine-month period, a 15% ownership interest in ABC Club, and a lucrative incentive structure." BAP Op. at 14–15. The panel concluded "[t]hese benefits provided White with reasonably equivalent value for his promise to repay the loans." BAP Op. at 17. On the Transfer Claim, the BAP, like the bankruptcy court, found "[t]he plain language of the Operating Agreement shows the parties did not intend to limit White's liability," which was unconditional. BAP Op. at 18–19. "Therefore," it concluded, "White remained liable on the entire debt" when he paid it, BAP Op. at 20, meaning "[i]t was a true dollar-for-dollar exchange" that necessarily "constitutes reasonably equivalent value," BAP Op. at 18.

This timely appeal followed.

## II

### A

"This is an appeal from a BAP decision," but "we review only the Bankruptcy Court's decision." *Johnson* v. *Riebesell (In re Riebesell)*, 586 F.3d 782, 788 (10th Cir. 2009) (quoting *Alderete* v. *Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1204 (10th Cir. 2005)). "By this we do not mean that we ignore the procedural posture of the case before us . . . . Rather, we mean

16

that we treat the BAP as a subordinate appellate tribunal whose rulings are entitled to no deference (although they certainly may be persuasive)." *Id.* (quoting *Mathai* v. *Warren (In re Warren)*, 512 F.3d 1241, 1248 (10th Cir. 2008)).

This case requires us to review the bankruptcy court's summary judgment rulings. Even in this bankruptcy context, we apply the usual standard of review for cases resolved on summary judgment. *See* Fed. R. Bankr. P. 7056 (incorporating Federal Rule of Civil Procedure 56 in adversarial bankruptcy proceedings). "We review the [bankruptcy] court's grant of summary judgment de novo, applying the same standards that the [bankruptcy] court should have applied." *Tesone* v. *Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (quoting *EEOC* v. *C.R. Eng., Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011)). Specifically, drawing all reasonable inferences for the nonmoving party—here, the Trustee[12]—this "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

_____

[12] Wardley was the movant for summary judgment on the Transfer Claim. Though he sought summary judgment on the Guaranty Claim, the court reserved ruling on it. Later, the Trustee moved for summary judgment on the Guaranty Claim. In response, Wardley did not separately file a formal motion but only asked the court to grant summary judgment to him in his opposition. Under these circumstances, we treat the Trustee as effectively the nonmovant for both claims for purposes of this standard. As the Trustee's opening brief puts it, we "must view the evidence and draw reasonable inferences in the light most favorable *to the losing party*," which was him on both claims. Op. Br. at 16 (emphasis added). Wardley does not argue otherwise.

material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Adamson* v. *Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (citation omitted).

As a general matter, "[t]he determination of reasonably equivalent value is a fact intensive inquiry." *Christensen* v. *Christensen (In re Christensen)*, No. 11-30743, Adv. No. 13-2248, 2014 WL 1873401, at *4 (Bankr. D. Utah May 8, 2014) (citing *Parks* v. *Persels & Assocs., LLC (In re Kinderknecht)*, 470 B.R. 149, 169 (Bankr. D. Kan. 2012)); *see also, e.g., r2 Advisors, LLC* v. *Equitable Oil Purchasing Co.* (*In re Red Eagle Oil, Inc.*), 567 B.R. 615, 629 (Bankr. D. Wyo. 2017) (similar). Still, the question of reasonable equivalence can be resolved on summary judgment if the record reveals no genuine disputes of material fact. Fed. R. Civ. P. 56(a); *see Expert S. Tulsa, LLC* v. *Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC)* (*Tulsa I*), 534 B.R. 400, 413 (B.A.P. 10th Cir. 2015) (holding "[d]etermination of reasonably equivalent value is ordinarily a finding of fact," but "where the facts of the transaction are

undisputed, the issue presented is whether or not those facts fit within the statutory parameters, which is an issue of law").[13] No party suggests otherwise.

## B

We now outline the applicable law on reasonably equivalent value, which governs both the Guaranty and Transfer Claims.[14]

---

[13] Even assuming, contrary to *Tulsa I*, the ultimate question of whether two sides of a transaction are reasonably equivalent is ordinarily for the jury, we will explain why the summary judgment record in this case reveals no genuine disputes of material fact on reasonable equivalence.

[14] At the outset, we note the applicable time the Trustee had to bring suit was "four years after the transfer was made or the obligation was incurred." Utah Code Ann. § 25-6-305(2) (West 2025). This action was brought after that time. The last transfer at issue, and thus the latest time this four-year clock may have started, came in July 2011. The Trustee brought this adversary proceeding in 2016, more than four years later. Wardley asserted a statute-of-limitations defense in the answer, and it appears in the Stipulated Pretrial Order. He never litigated that defense, however.

We ultimately need not interrogate timeliness. It is true that some jurisdictions treat this four-year time limit for fraudulent-transfer actions as statutes of repose that "cannot be waived," as opposed to statutes of limitations that can. Spero, *supra* § 4:23. Utah, though, is not one of those jurisdictions. Applying Utah Supreme Court law on how to determine whether a time limit is a statute of limitations or a statute of repose, the Utah Court of Appeals found a different subsection within § 25-6-305—similar in all relevant respects to the subsection at issue—"is a statute of limitation." *Selvage* v. *J.J. Johnson & Assocs.*, 910 P.2d 1252, 1259 (Utah App. 1996). We find that analysis persuasive and thus conclude this four-year limit in the UFTA is a statute of limitations.

That conclusion is important because there is no question statutes of limitations are nonjurisdictional, even if statutes of repose are sometimes jurisdictional. *See, e.g., O'Donnell* v. *Parker*, 160 P. 1192, 1194 (Utah 1916) (holding, "when one fails to plead the statute of limitations in a pending

The Bankruptcy Code allowed the Trustee to step into the shoes of unsecured creditors and bring state-law claims to recover fraudulently transferred assets. *See* 11 U.S.C. §§ 544(b)(1), 550. The Trustee invoked the UFTA, which provides that "[a] transfer made or obligation incurred by a debtor is voidable" under certain circumstances. Utah Code Ann. § 25-6-203(1). According to the Utah Supreme Court, the UFTA's "purpose" is to "provide[] a remedy for creditors who are actually harmed when a debtor transfers property [or undertakes an obligation]." *Rupp*, 358 P.3d at 1064.

This case turns on Utah Code Ann. § 25-6-203(1)(a), which asks whether the debtor received "reasonably equivalent value in exchange for" making the transfer or incurring the obligation. "In cases where the debtor does receive reasonably equivalent value, the transfer [or obligation] puts one asset beyond the reach of the creditors, but replaces the asset with one of equivalent value,

_____

proceeding, he is held to have waived it" in that proceeding); *Benne* v. *Int'l Bus. Machs. Corp.*, 87 F.3d 419, 425 (10th Cir. 1996) (similarly recognizing defendants can waive the affirmative defense that a statute of limitations has run). That means we are under no independent obligation to assess whether the statute of limitations applies if, as here, no party has raised the issue to us. *See Animal Legal Def. Fund* v. *Kelly*, 9 F.4th 1219, 1226 n.6 (10th Cir. 2021) ("[O]urs is a party-directed adversarial system and we normally limit ourselves to the arguments the parties before us choose to present." (alteration in original) (quoting *United States* v. *Ackerman*, 831 F.3d 1292, 1299 (10th Cir. 2016))); *cf. Fabrizius* v. *USDA*, 129 F.4th 1226, 1240 n.8 (10th Cir. 2025) ("[W]hether or not raised by the parties, we are obligated to satisfy ourselves as to our own *jurisdiction* at every stage of the proceeding." (emphasis added) (quoting *M.S.* v. *Premera Blue Cross*, 118 F.4th 1248, 1261 (10th Cir. 2024))).

thus avoiding any harm to creditors." *Rupp*, 358 P.3d at 1064. For that reason, "the degree to which the transferor's [or obligor's] net worth is preserved" is of central importance for the reasonable-equivalence inquiry. *Klein* v. *Cornelius*, 786 F.3d 1310, 1321 (10th Cir. 2015) (quoting *SEC* v. *Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)).

Neither the UFTA nor the Bankruptcy Code defines the phrase "reasonably equivalent value." The Utah Supreme Court has expounded little on the UFTA.[15] And this court has scarcely analyzed reasonable equivalence.[16]

---

[15] For example, *Rupp* v. *Moffo* analyzes whether a "transfer of fully-encumbered property . . . constitute[s] a fraudulent transfer under the" UFTA. 358 P.3d 1060, 1064 (Utah 2015). But it does not address what makes value reasonably equivalent.

[16] In one case involving reasonably equivalent value, we found the transfer at issue "only served to diminish [a business's] net worth," so it did not confer any value at all, let alone reasonably equivalent value. *Klein* v. *Cornelius*, 786 F.3d 1310, 1321 (10th Cir. 2015). In another, there was no question reasonably equivalent value was conferred so long as we found a business released the debtor from a loan obligation, as the size of that obligation greatly exceeded what the debtor gave up. *RE3 Dev., LLC* v. *Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC) (Tulsa II)*, 842 F.3d 1293, 1297 (10th Cir. 2016). The central question was merely "whether there was a release" because, if so, "it is obvious that Debtor received at least reasonably equivalent value for the property" that was worth much less than that release. *Id.* In a third, unpublished case, we found the district court had overlooked several facts that tended to create a genuine dispute about the value the debtor received. *Rajala* v. *Gardner*, 661 F. App'x 512, 517 (10th Cir. 2016) (unpublished). But those case-specific facts offer little in the way of doctrinal guidance. Under these circumstances, we rely on the persuasive reasoning in district court, bankruptcy court, and BAP decisions; our own unpublished decisions; and out-of-circuit opinions.

21

We recognize the concept of "[r]easonably equivalent value is not susceptible to simple formulation." *Harman* v. *First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479, 484 (4th Cir. 1992) (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J. 55, 80 (1991)). But the parties generally do not dispute the applicable law. Our review of the law on reasonably equivalent value evinces several principles that guide our analysis.

*First*, the reasonably-equivalent-value analysis generally involves "three inquiries": "(1) whether value was given; (2) if value was given, whether it was given in exchange for the transfer [or obligation]; and (3) whether what was transferred [or promised] was reasonably equivalent to what was received." *Rajala* v. *Gardner*, 661 F. App'x 512, 516 (10th Cir. 2016) (unpublished) (citing *Tulsa I*, 534 B.R. at 413);[17] *see also* Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning and Exemptions* § 2:17 & n.24 (2024) (citing *Mann* v. *Brown (In re Knight)*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012)) (similar).

*Second,* courts and commentators broadly agree we assess value "as of the date of the transfer [or obligation]," *Red Eagle*, 567 B.R. at 627, "without

---

[17] *Rajala* analyzed reasonable equivalence under the Kansas Uniform Fraudulent Transfer Act, which is similar in all relevant respects to the UFTA. *See* 661 F. App'x at 515 (citing Kan. Stat. Ann. §§ 33-201 to 33-212 (2016)). We cite all unpublished decisions only for their persuasive value. *See* 10th Cir. R. 32.1(A).

the benefit of hindsight," *Buchwald Capital Advisors LLC* v. *JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, No. 06-12737, Adv. Nos.07-02780, 08-01734, 2009 WL 3806683, at \*13 (Bankr. S.D.N.Y. Nov. 10, 2009); *accord* Spero, *supra* § 2:17 ("For purposes of determining [reasonable equivalence], the value of the property at the time of transfer [or obligation] is used."). Though we have not passed on the issue, the parties, the bankruptcy court, and the BAP all relied on the Third Circuit's framework for "how to determine whether an investment that failed to generate a positive return nevertheless conferred value on the debtor." *Mellon Bank, N.A.* v. *Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996).

In *R.M.L.*, the Third Circuit held courts should assign no value to "investments that, when made, have zero probability of success." *Id.* But "risks that, if successful, could generate significant value" as of the date the risk is taken *can* confer substantial value at the time, even if the risk ultimately did not pay off. *Id.* "The best solution," the court of appeals explained, is "to determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return." *Id.* The court then looked at "the size of the chance" that the investment would pay off handsomely. *Id.* at 153.

We conclude this framework is instructive here. An important balance is struck by focusing on the circumstances existing when the investment was

23

contemplated: creditors are protected from "irresponsible debtor[s]" who "invest[] in a venture that is obviously doomed from the outset," but legitimate transactions that conferred real value *at the time* are encouraged—even if the risk does not pay off *later. Id.* at 152; *see also id.* at 151 ("Presumably the creditors whom [fraudulent-transfer laws] w[ere] designed to protect want a debtor to take *some* risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code . . . .").

*Third*, the Supreme Court teaches "'reasonably equivalent' means 'approximately equivalent,' or 'roughly equivalent.'" *BFP* v. *Resolution Tr. Corp.*, 511 U.S. 531, 538 n.4 (1994). "There is no minimum percentage or amount necessary to constitute reasonably equivalent value and the exchange of value need not be dollar-for-dollar." *Christensen*, 2014 WL 1873401, at *4 (quoting *Kinderknecht*, 470 B.R. at 170).[18]

---

[18] This circuit has not elaborated on how close value must be to be reasonably equivalent, but some persuasive cases provide a few guideposts. For instance, the Tenth Circuit BAP has suggested, in *dicta*, receiving *only* $3 million for property worth $4.99 million is not reasonably equivalent. *Expert S. Tulsa, LLC* v. *Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC) (Tulsa I)*, 534 B.R. 400, 413 (B.A.P. 10th Cir. 2015). But the court went on to discuss other benefits received for the property at issue, ultimately finding the party claiming a lack of reasonable equivalence failed to meet its burden. *Id.* at 413–15. And the Sixth Circuit found gambling debts to a Las Vegas casino carried reasonably equivalent value; while each bet's expected *monetary* value was negative, the court found the expected payout (around 94–99% of the value of each bet) *plus entertainment value* was reasonably equivalent to the value of the bets. *Allard* v. *Flamingo Hilton (In re Chomakos)*, 69 F.3d 769, 771–72

24

*Finally*, "[f]actors, other than the amount, may also [a]ffect the" reasonable-equivalence analysis. Spero, *supra* § 2:18. Some of these factors include "the good faith of the parties" and "whether the transaction was a[t] arm's length." *Red Eagle*, 567 B.R. at 628–29; *see also BFP*, 511 U.S. at 538 (clarifying full value is less likely to be found when property is "s[old] at public auction or [in] a sale forced by the necessities of the owner" (quoting *Market Value*, Black's Law Dictionary (6th ed. 1990))). This attention to context makes sense, particularly given the fact-intensive nature of the reasonable-equivalence inquiry and the concerns animating fraudulent-transfer doctrine generally. *See* Spero, *supra* § 2:17 (confirming "the purpose of the fraudulent transfer laws" is "to protect the debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors"); *Rupp*, 358 P.3d at 1064 (similar).

### C

Applying these principles, we begin with the Guaranty Claim. Mirroring the three inquiries outlined above, we explain why we conclude (1) "value was given," (2) it was given "in exchange for" White undertaking the guaranty obligation, and (3) what White gave up under that obligation "was reasonably equivalent to what [he] received" in exchange. *Rajala*, 661 F. App'x at 516.

---

(6th Cir. 1995). As we will show, this question of how close values must be to be reasonably equivalent depends largely on context.

25

**1**

There is no dispute White received some value when he promised to personally guarantee up to $750,000 in loans made by Wardley. The bankruptcy court specifically identified:

1. Promised employment with ABC for a $20,000 monthly salary;

2. A 15% stake in ABC;

3. A cash incentive worth up to $500,000 and a five- to ten-percentage-point equity incentive for selling enough cards by certain dates; and

4. A business opportunity White sought.

The Trustee concedes White "did receive" these "benefits," Op. Br. at 23, and he does not contest that each carried *some* value. We therefore resolve the first of the three reasonable-equivalence inquiries for Wardley.

**2**

We next show each benefit "was given in exchange for" White undertaking the guaranty obligation. *Rajala*, 661 F. App'x at 516. We have held a benefit was conferred "in exchange for" an obligation or transfer when the obligation or transfer "was undoubtedly a but-for cause of the" benefit. *RE3 Dev., LLC* v. *Cornerstone Creek Partners, LLC (In re Expert S. Tulsa, LLC)* (*Tulsa II*), 842 F.3d 1293, 1299 (10th Cir. 2016) (quoting 11 U.S.C. § 548(a)(1)(B)(i); Okla. Stat. tit. 24, § 117(A) (2025)); *see* Utah Code Ann.

26

§ 25-6-203(1)(a) (using the same "in exchange for" formulation). We find that standard clearly met as to each of the four benefit categories described above.

*Employment.* That White's employment with ABC, and thus his salary, owed to the guaranty is beyond debate. According to the Operating Agreement, "Ted White acknowledges the personal benefit Mr. Wardley's organization and capitalization of the Company has provided to Mr. White *in the form of his employment by . . . the Company. Accordingly*, Mr. White hereby personally guarantees the repayment . . . of Mr. Wardley's loans, up to $750,000.00 . . . ." RVIII.895 (emphasis added). Wardley's loans constituted by far the largest source of funds for White's salary, and the parties agree Wardley would not have made those loans if not for the guaranty. The guaranty "was undoubtedly a but-for cause of the" employment opportunity and associated salary. *Tulsa II*, 842 F.3d at 1299; *see also* RXI.1392–93 (noting the Trustee "does not dispute" White and Wardley orally agreed "that ABC Club would employ White *in exchange for the guaranty*" (emphasis added)).

*The 15% stake.* Our analysis is much the same as to White's 15% stake. The Operating Agreement provides: "Ted White acknowledges the personal benefit Mr. Wardley's organization and capitalization of the Company has provided to Mr. White *in the form of his . . . promotional ownership interest in the Company. Accordingly*, Mr. White hereby personally guarantees the repayment . . . of Mr. Wardley's loans, up to $750,000.00 . . . ." RVIII.895

27

(emphasis added). Under this plain language, the guaranty "was undoubtedly a but-for cause of" White's equity stake. *Tulsa II*, 842 F.3d at 1299.

The Trustee suggests each co-owner's stake instead owes to the nominal shares of $1,000 they contributed to ABC—so White received his 15% stake not for the guaranty, but rather for his $150 contribution.[19] But the unambiguous language of the Operating Agreement forecloses that argument.

*Cash and equity incentives.* The Executive Employment Agreement provided White with a $1 incentive per card sold up to 250,000 cards—and it gave Wardley the power to extend that incentive for another 250,000 cards, for a total possible value of $500,000. And a separate agreement would give White five percentage points of additional equity if ABC sold 1 million cards within twelve months of its first commercial shipment—and ten total percentage points if ABC sold 1.8 million cards within eighteen months of that date.

The latter of those incentives is not described in the Operating Agreement, where the guaranty's terms are found. But the bankruptcy court was still correct to attribute all of these incentives to the guaranty. These were all part of "the deal White and Wardley struck," and they were "presumably"

_____

[19] As a threshold matter, Wardley points out ABC's ledgers do not reflect White even paid this $150 contribution. *See* Resp. Br. at 32–33, 32 n.8. The Trustee responds this is not determinative of whether White actually paid his contribution. Reply Br. at 11 n.5. At this procedural stage, we construe genuine factual disputes in the Trustee's favor, so we assume White paid the $150. Either way, our disposition does not change.

"not individualized . . . in the minds of the parties." BAP Op. at 15; RXI.1392 (Wardley testifying "[a]ny monies that I forwarded to ABC, et cetera, Ted White guaranteed or I wouldn't have forwarded them in my mind"). The "considerable compensation" White received in exchange for the guaranty included these incentives. RXI.1436.

*Business opportunity.* As the BAP put it, "[b]ut for Wardley's loans, White would not have had the opportunity to play his hand at the medical discount card business." BAP Op. at 13 (italics omitted). The guaranty enabled the loans that enabled the business opportunity. Even the Trustee does not argue otherwise. We therefore agree with the bankruptcy court and BAP that this additional source of value owed to the guaranty.

Thus, we conclude all four of these benefit categories "was given in exchange for" the guaranty obligation. *Rajala*, 661 F. App'x at 516.

**3**

We finally address whether what White lost for making the guaranty "was reasonably equivalent to" the benefits he received in exchange. *Id.* We will find reasonable equivalence if what White lost and gained from the guaranty "approximately" or "roughly" offset. *BFP*, 511 U.S. at 538 n.4.

The bankruptcy court began its reasonable-equivalence inquiry by considering whether ABC was likely to succeed when White undertook the guaranty. On that front, the court concluded "there are no allegations or facts

29

to suggest that at the time of its formation, ABC Club had 'zero probability of success,' was 'obviously doomed from the outset,' or that it was a sham or unreasonable investment." RXI.1433 (quoting *R.M.L.*, 92 F.3d at 152). "Based on this," the bankruptcy court found "that the value received by [White] in exchange for the Guaranty was at least equal to his liability thereunder," thereby constituting reasonably equivalent value. RXI.1434. The BAP reached the same conclusion. Reviewing the bankruptcy court's decision *de novo, see Tesone,* 942 F.3d at 994, we agree.[20]

**a**

The record confirms White and Wardley acted in good faith and negotiated at arm's length. Nobody suggests otherwise. *See Red Eagle*, 567 B.R. at 628–29 (noting "the good faith of the parties" and "the transaction [being] a[t] arm's length" are two factors supporting reasonable equivalence). All that is left, therefore, is the "disparity between the fair value of the transferred property and what the debtor received." *Id.* at 628. If the business was doomed from the start, then ABC would not be expected to pay off much of the loaned amount, so White would be on the hook for almost all of what Wardley would loan, up to $750,000. And the above-described benefits would

---

[20] The dissent would set aside the summary judgment in favor of Wardley and remand the issue for trial. For the reasons explained here, we respectfully cannot endorse the dissent's conclusion.

be close to worthless. But if ABC was expected to succeed when White agreed to guarantee the loans, then the opposite is true: White would not be expected to be on the hook for very much, and each of the benefits would be highly valuable. We agree with the bankruptcy court that this inquiry hinges largely on whether ABC was likely to succeed as of December 2010, when White undertook the obligation to repay the loans.[21] *See R.M.L.*, 92 F.3d at 152.

The Trustee insists "the undisputed facts" do not "prove[], as a matter of law, that the probability of ABC Club's success was sufficiently certain to" resolve on summary judgment. Op. Br. at 35. The bankruptcy court and BAP disagreed. Recall, the bankruptcy court found "no allegations or facts to suggest that at the time of its formation, ABC Club had 'zero probability of success,' was 'obviously doomed from the outset,' or that it was a sham or unreasonable investment." RXI.1433 (quoting *R.M.L.*, 92 F.3d at 152). The BAP took a similar approach, also finding the Trustee "provided no evidence [at summary judgment] . . . in support of his position" that ABC may have been doomed from the start. BAP Op. at 16. We discern no error in these rulings.

---

[21] To clarify, for this case, the date at which we assess value is December 6, 2010, the date of ABC's incorporation, rather than April 7, 2011, the day the co-owners signed the Operating Agreement (or any other date). White and Wardley had already orally agreed to the guaranty by that December date, and the Operating Agreement was backdated to that same day. The bankruptcy court agreed with this conclusion, and no party challenges it.

We acknowledge at the outset the generally high bar that attends to removing factual questions from a factfinder's ambit. But we have little trouble resolving that determination in favor of Wardley here, where *some* evidence suggests ABC had a chance to succeed at the outset, and *no* evidence suggests otherwise.

The operative historical facts in this case are undisputed. And those facts point in only one direction: suggesting ABC was reasonably likely to succeed. White, who ran ABC, had experience with other companies in the supplemental insurance card industry. Through that experience, he "had developed marketing strategies and owned domain names and software." RXI.1416. ABC had a reliable funding source through Wardley's loans. And the business began without obvious encumbrances.

What is more, the Operating Agreement expressed "[t]he Members anticipate that the Company will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to the Company with interest." RVIII.895. White testified he expected ABC would "be worth . . . millions of dollars" and he would "sell millions of cards." RXI.1417. And Wardley did not back away from the business after reaching the $750,000 in loans White had guaranteed; indeed, he lent almost a half million dollars above this amount, evincing his belief in the business. While ABC ultimately failed, that does not suggest failure was inevitable *at the time of the guaranty*. On the

32

record before us, we find *no* "circumstances that existed at the time the investment was contemplated" that rendered "a positive return" highly unlikely. *R.M.L.*, 92 F.3d at 152.

The Trustee urges reversal, insisting ABC was essentially doomed from the start. But we find no evidence supports the Trustee's position.

*First*, the Trustee points to evidence that White's earlier companies suffered high losses and needed capital. The Trustee seems to argue there is a fact question on whether ABC—like White's other ventures—was vulnerable at the outset. On the record before us, we disagree. As the bankruptcy court explained, ABC assumed none of those prior businesses' debts, so facts "relate[d] to" those prior businesses "are untethered from the issue of what property interests the Debtor received and the value of such property resulting from the Guaranty." RXI.1434.

*Second*, the Trustee observes the co-owners of ABC only invested a total of $1,000. The size of this upfront investment is significant, the Trustee seems to believe, because it would allow a factfinder to infer ABC was inadequately capitalized and thus doomed to fail. But the Trustee overlooks that ABC *did* have a cash source: Wardley's loans. And Wardley's contractual duty to loan to ABC was constrained by the covenant of good faith and fair dealing, implied in Utah contracts. *See Res. Mgmt. Co.* v. *Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1037 (Utah 1985) ("[A]n implied covenant of good faith forbids arbitrary

33

action by one party that disadvantages the other."); *id.* at 1037–38 (collecting Utah cases to this effect). ABC thus had a funding source, despite the co-owners' low capitalization. On this evidence, no "rational jury could find" ABC's initial funding structure meant it had almost no chance of succeeding, as the Trustee urges. *Adamson*, 514 F.3d at 1145.

*Third*, Wardley required the guaranty to be secured by an interest in the $15.5 million judgment, and this collateral requirement, says the Trustee, shows concern about ABC's chance of success. The idea appears to be Wardley was actually nervous about ABC's success—or he never would have required that security. But the record suggests otherwise. In the Operating Agreement, Wardley and the other co-owners said they "anticipate[d] that the Company will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to the Company with interest." RVIII.895. A contrary inference, simply from an agreement to give collateral, is unreasonable in light of that unambiguous language.

*Finally*, the Trustee claims a factfinder could rationally infer ABC was unlikely to pay back the debt to Wardley because, at the outset, the company had no customers and few assets. We assess value "as of the date of the transfer [or obligation]," *Red Eagle*, 567 B.R. at 627, "without the benefit of hindsight," *M. Fabrikant & Sons*, 2009 WL 3806683, at *13. Here, the relevant date at which we assess value is December 6, 2010—the *very date* of ABC's

34

incorporation. A rational factfinder could not conclude ABC was essentially doomed because it had no customers, few assets, and plans to take on some debt on its *very first day*. If we accepted "such a postulation, anyone who provides, deals with, or invests in an entity" in its early stages "would be doing so at his or her peril . . . which means, of course, that few would be likely to do so." *Butler Aviation Int'l, Inc.* v. *Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126–27 (5th Cir. 1993), *abrogated on other grounds by Tex. Truck Ins. Agency, Inc.* v. *Cure (In re Dunham)*, 110 F.3d 286, 288–89 (5th Cir. 1997). Instead, the record shows the co-owners were reasonable to expect "that the Company will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to the Company with interest." RVIII.895.

To that end, we agree with the bankruptcy court that this case's uncontroverted facts are usefully contrasted with those from *Wessinger* v. *Spivey (In re Galbreath)*, 286 B.R. 185, 211 (Bankr. S.D. Ga. 2002). In *Galbreath*, an *existing* business had negative net worth, enjoyed only "nominal" good will, and was "hemorrhaging" money—so the court found the opportunity to keep that "business on life support was simply not reasonably equivalent to $1.5 million." *Id.* at 211. Here, no evidence indicates these or similar factors were present when White and Wardley founded ABC.

Having examined the summary judgment record, we agree with the bankruptcy court that "the best evidence, indeed the only evidence at the time

35

of the Guaranty, is that both parties viewed the potential financial rewards of the ABC Club business venture to be far greater than the accompanying risks of their investments," and those views were reasonable. RXI.1437. We are therefore convinced no rational factfinder could conclude, as the Trustee urges, "the circumstances that existed at the time" suggest an investment in ABC had even close to "zero probability of success." *R.M.L.*, 92 F.3d at 152.[22]

**b**

Having concluded the summary judgment record establishes that ABC was at least reasonably likely to succeed as of December 6, 2010, we now turn to how that affects what White "gained" and "lost" for guaranteeing to repay Wardley's loans up to $750,000. The bankruptcy court and BAP both found that likelihood of success meant White gained about as much as—perhaps even more than—the guaranty liability was worth. *See* RXI.1437; BAP Op. at 16–17. We now show why we agree with that conclusion.

---

[22] To be sure, ABC's success was not assured, but certainty is not required. *See Mellon Bank, N.A.* v. *Off. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996) (finding value in "legitimate, pre-bankruptcy efforts to take risks that, if successful, could generate significant value and, possibly, avoid the need for protection under the [Bankruptcy] Code altogether"); *id.* at 151 ("Presumably the creditors whom [fraudulent-transfer laws] w[ere] designed to protect want a debtor to take *some* risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code . . . .").

Beginning with White's debts under the guaranty, we find ABC's likely success reduced his debt below $750,000. The evidence shows ABC's co-owners expressed their shared expectation that the Company would profit enough to repay Wardley. Further reflecting that expectation, the Operating Agreement provided a means of calculating White's obligation *after ABC would have paid off some of the loans*. *See* RVIII.895. The Operating Agreement even mandated cash distributions of $0.55 per card sold to pay off Wardley's loans. RVIII.893. No evidence undermines the co-owners' expectations that ABC had a reasonable chance of succeeding. At the time, White was therefore likely to be on the hook for well less than the full $750,000, meaning the value of White's debt was correspondingly smaller.

As the Trustee concedes, White's obligations under the guaranty may have been less than $750,000 for a distinct reason: at the time of the guaranty, it was possible Wardley may have loaned less than $750,000—for instance, had ABC earned more money on its own. *See* Op. Br. at 31 (noting the fact "that Wardley ultimately made loans to ABC Club in excess of $750,000" is "a hindsight fact of the type which should be disregarded"). Nothing in the Operating Agreement compelled Wardley to lend that much. *See* RVIII.895 (granting Wardley some "discretion" over "lend[ing] cash to the Company"). It was possible at the time of the guaranty he would have loaned less, and the

37

expected value of White's debt under the guaranty would have then been less than $750,000.

The record also shows that, by undertaking the guaranty obligation, White gained substantial benefits. We now explain why, looking at the time of the deal in December 2010, each benefit received "in exchange for" the guaranty was valuable to White. Utah Code Ann. § 25-6-203(1)(a).

*Employment.* The record establishes White's employment was valuable. While neither the Operating Agreement nor the Executive Employment Agreement listed a specific salary, White testified at his deposition that he was being paid "[$]20,000 a month."[23] RXI.1420 (alteration in original). No party disputes that understanding. And that actually played out. Before Wardley stopped lending money for salary purposes, White had earned more than $26,000 a month at ABC. A $20,000-or-higher monthly salary can quickly total hundreds of thousands of dollars in expected value, provided the employment lasts longer than a few months. Based on the summary judgment record, there

---

[23] The BAP said "[t]he Executive Employment Agreement granted White discretion to set his own salary." BAP Op. at 5. But, as the Trustee points out, that misreads the Executive Employment Agreement. The agreement grants discretion to set the salary to "the Manager of the Company." RVIII.900. And, for purposes of that agreement, *Wardley*, not White, was the manager. RVIII.903 (Wardley signing the agreement as ABC's manager); *see also* RVIII.899 (requiring "Employee"—*i.e.*, White—to "report to the Company's Manager," meaning White could not have been the manager for purposes of this agreement). Still, we show why White's employment opportunity was valuable, even without discretion to set his own salary.

was no reason to doubt, at the time of the guaranty, ABC would last at least many months.

The Trustee insists the employment opportunity lacked value, but his arguments are unavailing.

*First*, the Trustee argues the promise of employment, of itself, "was not one that the Debtor or any of his creditors could take to the bank and did not, by itself, have any realizable commercial value to creditors." Op. Br. at 33. Maybe so, but White's salary is a quintessential source of bankable value that carries value for creditors.

*Second*, the Trustee says the bankruptcy court focused unduly on the $235,000 White *actually* earned, rather than what he was *expected* to earn when he guaranteed the loans. That is not what the bankruptcy court did. Rather, it used White's total salary to emphasize it was plausible to believe he would earn a substantial sum—as he did. *See* RXI.1429–30.[24]

---

[24] Further, we find compelling Wardley's observation that the Trustee's argument may "unwittingly strengthen[] the Bankruptcy Court's finding." Resp. Br. at 36. There is little reason to think the *expected* value of White's salary at the outset was lower than $235,000; rather, "[b]ecause the $20,000 monthly payment was to be in perpetuity, contingent only on 'minimum performance levels' . . . , the $235,000 [may have been] much lower of a value than the amount of money White stood to receive in a business expected to prosper." Resp. Br. at 37–38 (quoting RVIII.900). Put differently, if the bankruptcy court fixated unduly on the $235,000 White ultimately earned, it may have thereby *under*estimated, not *over*estimated, the employment opportunity's value at the time of the guaranty.

*Third*, the Trustee claims the value of White's employment "is not equal to [White's] salary" because "he had to work for it." Reply Br. at 13. Insofar as the Trustee suggests that because the costs of working are high, the employment opportunity's total value is at or near zero, we are unconvinced. A bankruptcy treatise confirms value "is determined from a creditor's viewpoint and [in] accordance with the purpose of the fraudulent transfer laws, namely, to protect the debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors." Spero, *supra* § 2:17. Relatedly, the reasonable-equivalence inquiry largely centers on "the degree to which the transferor's [or obligor's] net worth is preserved." *Klein*, 786 F.3d at 1321 (quoting *Res. Dev. Int'l*, 487 F.3d at 301). Whatever the downsides of working, they are of no moment from an unsecured creditor's perspective. Those downsides affect neither the size of the bankruptcy estate nor the debtor's net worth. White's $20,000-or-greater salary increased both. And nothing suggests, at the outset, that White was unlikely to work very much; to the contrary, White testified he expected to "*run the company*, sell millions of cards, and get my 15 percent, *and be paid a salary*." RXI.1417 (emphasis added).

*The 15% stake.* The evidence in the summary judgment record also confirms White's equity stake was likely valuable at the time of the guaranty. As the Trustee observed, "It is undisputed that White believed that his discount-medical-cards business 'was going to be worth millions,'" including if

operated through "a new start-up entity"—*i.e.*, ABC. RXI.1381. As discussed, evidence supports that ABC had some reasonable chance of success. The 15% stake therefore had considerable value.

*Cash and equity incentives.* The cash and equity incentives White received were also valuable when ABC was formed. The expected value of the cash incentive was calculable according to the terms of the Executive Employment Agreement—that is, ($1 times the expected number of cards ABC would sell, up to 250,000) plus (($1 times the expected number of cards ABC would sell between 250,001 and 500,000) times the probability Wardley would allow this second incentive). *See* RVIII.893. And Wardley had plenty of reasons to unlock this second $250,000 incentive. For one thing, Wardley's majority stake in ABC would presumably be more valuable the harder White worked to sell cards. And the equity incentive could make White's stake in ABC even more valuable, if the above-described benchmarks were met. That further bolsters the value White received for the guaranty.

*Business opportunity.* Again, according to the BAP, "[b]ut for Wardley's loans"—and thus but for the guaranty—"White would not have had the opportunity to play his hand at the medical discount card business." BAP Op. at 13 (italics omitted). Much of that opportunity's value owes to the three value sources described above: the employment opportunity, equity stake, and incentives. Discussing them again under this heading could risk double-

41

counting benefits. But the Trustee does not meaningfully contest that White plausibly derived even more value from that "opportunity to play his hand."[25] BAP Op. at 13. We therefore agree with the bankruptcy court and BAP that this additional benefit conferred value on White. And in any event, the other three benefit categories would confer reasonably equivalent value in exchange for the guaranty obligation.

* * *

In sum, the guaranty caused White to lose some amount below $750,000. And it caused him to gain (i) employment, (ii) the 15% stake, (iii) the cash and equity incentives, and (iv) other benefits from having the opportunity to start ABC. As we have shown, the summary judgment record compels the conclusion that ABC had at least some reasonable chance of success at the time of the guaranty. We thus agree with the bankruptcy court that, in exchange for the guaranty, White gained benefits that are at least "'approximately equivalent,' or 'roughly equivalent'" to the value of the debt he took on. *BFP*, 511 U.S. at 538 n.4; *see* RXI.1437 ("[T]he Debtor received reasonably equivalent value that was equal to or greater than the liability he assumed under the Guaranty.").

---

[25] The Trustee instead simply argues the loans that enabled the business opportunity were loans to ABC, not White, and the Operating Agreement gave Wardley discretion over whether to lend at all. Op. Br. at 31–32 (citing RVIII.895). But none of that addresses whether these loans—and the consequent business opportunity White sought—conferred value on White.

Accordingly, we conclude no genuine issue of material fact exists over whether White received reasonably equivalent value for the guaranty.[26]

**4**

The Trustee offers a further argument for reversal on the Guaranty Claim. He insists the bankruptcy court—and then the BAP—mistakenly required him to prove White *had not* received reasonably equivalent value for the guaranty. The appropriate allocation of the burden of proof, according to the Trustee, would have been to require Wardley to show White *had* received reasonably equivalent value for the guaranty. In support, he marshals the so-called indirect-benefit rule, which he claims resolves this case in his favor.

The indirect-benefit rule concerns who bears the burden to provide evidence on whether a transaction carried reasonably equivalent value. This

---

[26] To be sure—particularly given the fact-intensive nature of the reasonable-equivalence inquiry—we can imagine circumstances where this would be a closer case at summary judgment. For instance, if there were any evidence suggesting, at the time of the transaction, that ABC was doomed from the start, if the Operating Agreement and party testimony were more equivocal about which benefits owed to the guaranty, if the benefits conferred were less specific or considerably smaller (or the debt much bigger), or if there was any reason to think the transaction between White and Wardley was not in good faith and at arm's length, then the Trustee's arguments might be more persuasive. But applying the well-settled standards at summary judgment, "a rational jury," *Adamson* v. *Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008), could reach only one conclusion on the record developed before the bankruptcy court.

court has not yet passed on the indirect-benefit rule.[27] And we can resolve this appeal without taking that step. Still, we explain the rule as background to understand the Trustee's arguments.

Ordinarily, "[t]he party seeking to avoid a constructively fraudulent transfer"—here, the Trustee—"bears the burden of proving[] that the transferor *did not* receive reasonably equivalent value." *Red Eagle*, 567 B.R. at 627. But, as a bankruptcy treatise summarizes, under the indirect-benefit rule, "Once the plaintiff [or bankruptcy trustee] makes a *prima facie* showing that no sufficient direct benefit was received in the transaction, it is the defendants' burden to prove sufficient benefit that is tangible and concrete." Spero, *supra* § 2:29 (alteration in original) (quoting *Cooper* v. *Centar Investments (Asia) Ltd (In re Trigem Am. Corp.)*, 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010)); *see also, e.g.*, *Unencumbered Assets Tr., as successor in interest to Nat'l Century Fin. Enters., Inc.* v. *Biomar Techs., Inc. (In re Nat'l Century Fin. Enters., Inc.)*, 341 B.R. 198, 216–17 (Bankr. S.D. Ohio 2006) ("[O]nce a

---

[27] The opening brief suggests this circuit has already adopted the indirect-benefit rule. Op. Br. at 22 (citing *Clark* v. *Sec. Pac. Bus. Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 243 (10th Cir. 1993)); Op. Br. at 42 (citing *Wes Dor*, 996 F.2d 237). But the reply brief's amended oral-argument statement appropriately backs off this suggestion, clarifying the key cited case arises in a different context and does not invoke this burden-shifting rule. *See* Reply Br. at 24; *Wes Dor*, 996 F.2d at 242 (considering but not deciding whether a transferee had provided the transferor value via indirect benefits, and not invoking or opining on who bears the burden under the indirect-benefit rule).

plaintiff has established that consideration for the transfer passed to a third-party, the burden of demonstrating and quantifying reasonably equivalent value for the transfer shifts to the defendant."). The indirect-benefit rule can come into play only when benefits flow from a defendant to a debtor through a third entity. When a benefit is indirect, "[t]he party claiming to have delivered value must quantify it." Spero, *supra* § 2:29 (quoting *Pummill* v. *Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 614 (B.A.P. 8th Cir. 2001)). Requiring the third party to quantify those benefits, the logic goes, helps determine whether there was reasonably equivalent value.

The bankruptcy court and BAP held the indirect-benefit rule does not apply because White effectively received his benefits *directly* from Wardley, not *indirectly* via ABC. *See* RXI.1427; BAP Op. at 13–14.[28] The Trustee suggests we should both adopt the rule and apply it to reverse because the benefits flowed to White *via an intermediary*: ABC. According to the Trustee, Wardley has not "come forward [with] evidence quantifying the reasonable

---

[28] The bankruptcy court found the benefits were direct because "both parties viewed the loans as being made to the Debtor for use at his discretion for the operation of ABC Club," and "there was no note between Defendant and ABC Club," whereas there was one between Wardley and White. RXI.1427. The BAP found the benefits were direct because "White's salary was funded by the loan proceeds;" "White did not have a bank account other than ABC Club's;" "White had sole authority and discretion over the loan proceeds;" and "White received an equity interest in the business." BAP Op. at 13.

commercial value of these benefits" described above, so the bankruptcy court should have granted summary judgment for the Trustee. Op. Br. at 29.

The Trustee points to some authority suggesting the indirect-benefit rule always kicks in when "sources other than the recipient of the transfer/payments" provide the value. Op. Br. at 28 (quoting Spero, *supra* § 2.29). Wardley offers other authority suggesting the "direct versus indirect" inquiry is not so formalistic. *E.g.*, Resp. Br. at 18 ("[B]ecause fraudulent conveyance remedies are intended to be equitable, 'the court is to examine substance over form.'" (quoting *United States* v. *Wilhite*, No. 00-cr-00504, 2016 WL 5720707, at *7 (D. Colo. Sept. 23, 2016), *aff'd*, 774 F. App'x 478 (10th Cir. 2019))); *see* Utah Code Ann. § 25-6-303 (allowing for creditors to obtain relief "subject to applicable principles of equity").[29]

In this case, we need not decide if the benefits were direct or indirect— or even whether the indirect-benefit rule applies—because our disposition would be the same regardless. On this summary judgment record, we can conclude the value received is "'approximately equivalent,' or 'roughly equivalent'" to the value of the debt White took on. *BFP*, 511 U.S. at 538 n.4. The business opportunity, employment opportunity and $20,000-or-greater

---

[29] We also note some benefits were not at all mediated by ABC. For instance, the equity incentive came directly from Wardley. *See* RVIII.904–05 (Wardley offering White some of *his own* equity stake on certain conditions).

monthly salary, 15% stake, and incentives of up to $500,000 and ten percentage points more equity are enough for us to affirm.

Cases are legion that "[w]e have discretion to affirm on any ground adequately supported by the record." *Elkins* v. *Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). We therefore agree with Wardley that the "distinction between direct and indirect benefits is merely academic and cannot change the outcome of this case." Resp. Br. at 22. We find the bankruptcy court did not err in holding White received reasonably equivalent value for the guaranty.[30] We thus affirm the grant of summary judgment to Wardley, and the denial of summary judgment to the Trustee, on the Guaranty Claim.[31]

---

[30] As the Fourth Circuit aptly put it:

> It seems apparent that the [obligation] ha[s] not resulted in the depletion of the bankruptcy estate. The [obligation] by the debtor served simply as repayment for money received. Other creditors should not be able to complain when the bankruptcy estate has received all of the money which it is obligated to repay. Otherwise, the creditors would receive not only the benefit of the money received from the draws on the lines of credit, but also the windfall of avoided [obligations] designed to repay the draws. In essence, the estate, and hence the unsecured creditors, would be paid twice.

*Harman* v. *First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479, 485 (4th Cir. 1992), *superseded by statute on other grounds as stated in Englander* v. *Hekman Furniture Co. (In re Mastercraft Interiors, Ltd.)*, Nos. 06-12759PM, 06-12770PM, 06-12769PM, Adv. No. 08-0383PM, 2009 WL 5219724, at *3 (Bankr. D. Md. Dec. 31, 2009).

[31] The Trustee assigns no specific error to the fact that the bankruptcy court granted summary judgment for Wardley on the Guaranty Claim even

**D**

We now turn to the Transfer Claim. The issue is whether the bankruptcy court correctly concluded White received reasonably equivalent value for the $750,000 transfer. Reviewing *de novo*, *see Tesone*, 942 F.3d at 994, we again discern no error.

The first question is whether value was given. We are guided by the Utah code, which says, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." Utah Code Ann. § 25-6-104(1). Nobody disagrees "value [wa]s given" through a reduction in White's antecedent debt under the

---

though it was *the Trustee* who had moved for summary judgment on it. *See, e.g.*, Op. Br. at 16–17 (conceding "summary judgment may be entered" when "there is no dispute as to the facts, and the facts justify judgment for" one party, even if the court does so "*sua sponte*"). Like the Trustee, we find no error in that procedural sequence. *See* Fed. R. Civ. P. 56(f)(1) (allowing courts to "grant summary judgment for a nonmovant"); *see also* 10A Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure: Civil* § 2720.1 & n.11 (4th ed. 2025) ("[T]he weight of authority is that summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56."); *Dickeson* v. *Quarberg*, 844 F.2d 1435, 1444 n.8 (10th Cir. 1988) (same).

While granting summary judgment for a nonmovant requires giving the movant "notice and a reasonable time to respond," Fed. R. Civ. P. 56(f), Wardley had requested summary judgment in his response to the Trustee's motion, and the Trustee had an opportunity to respond in his reply memorandum supporting summary judgment. The Trustee does not argue this constituted inadequate notice and opportunity to respond, so we do not interrogate that point further.

guaranty. *Id.* And there is no doubt this value "was given in exchange for the transfer." *Rajala*, 661 F. App'x at 516. The only question, therefore, is "whether what was transferred was reasonably equivalent to what was received." *Id.*

White paid Wardley $750,000 from his separate, $15.5 million judgment and, in return, received an equivalent reduction in his debt under the guaranty. As the BAP aptly points out, "Dollar-for-dollar exchanges are seldom questioned" on reasonable-equivalence grounds—and for good reason—but "this appeal represents one such rare occasion." BAP Op. at 1–2. Unless the Trustee can show White actually owed considerably less than the guaranty's face value of $750,000 at the time of the transfer, the transaction carried reasonably—even perfectly—equivalent value.

The Trustee insists White's guaranty debt was not worth $750,000 at the time of the transfer because the obligation to repay it was conditional. He focuses on the following language in the Operating Agreement, emphasized here:

> The Members anticipate that the Company will make profits in its business in sufficient amount to repay in full the amounts loaned by Mr. Wardley to the Company with interest thereon at the agreed rate. . . . Mr. White hereby personally guarantees the repayment of the full amount of Mr. Wardley's loans, up to $750,000.00, *such that to the extent the Company's cash distributions to Mr. Wardley during the first twelve (12) months of the Company's operations (commencing with the first commercial shipment of the card) do not total the amount owed on the loans he has made*, Mr. White shall pay Mr. Wardley personally the

49

shortfall. This is an irrevocable and unconditional promise[] to pay and not a guarantee of the Company's performance.

RVIII.895 (emphasis added). The Trustee interprets that language to mean White's "liability on the guarant[y] did not arise unless and until (1) ABC Club had twelve months of operations following its first commercial shipment of cards and (2) the distributions to Wardley during that period did not total the amount owed on the loans he had made to ABC Club." Op. Br. at 38. Wardley does not dispute that, at the time of the transfer, these circumstances had not occurred. Thus, according to the Trustee, the true value of that obligation was $750,000 *times the probability that condition would later be triggered*—which is well less than $750,000.

Looking to the Operating Agreement, the bankruptcy court refused to accept the premise that White's obligation to repay was conditional. The plain language of the Operating Agreement confirms the opposite was true: "This is an irrevocable and unconditional promise[] to pay and not a guarantee of the Company's performance." RV.699 (bolding omitted) (quoting RVIII.895). Contrary to the Trustee's suggestion, therefore, Wardley did not need to wait a year from that first shipment to see what ABC would pay off before collecting on the debt from White; rather, White and ABC were "concurrently liable" at the time of the transfer. RV.700.

50

The BAP agreed. "Taken to its illogical conclusion," the panel explained, the "Trustee's argument is that, unless these . . . conditions were fully met, White owed Wardley nothing, and the funds were nothing more than a gift." BAP Op. at 18. "[A]pplying the Trustee's scenario," the court continued, "White could have made sure ABC Club did not perform, walked away, kept the money, and left Wardley holding a $750,000 bag." BAP Op. at 19.

We agree with the bankruptcy court. The reasonable-equivalence analysis on the Transfer Claim turns on whether, under the Operating Agreement, any conditions existed before payment on the guaranty obligation came due—a question of contract interpretation. If the obligation to pay was unconditional, there is no question reasonably equivalent value was conferred because the size of the transfer *exactly equaled* the size of the debt reduction.

The Utah Supreme Court has confirmed, "When we interpret a contract 'we first look at the plain language [of the contract] to determine the parties' meaning and intent.'" *Brady* v. *Park*, 445 P.3d 395, 407 (Utah 2019) (alteration in original) (quoting *Meadow Valley Contractors, Inc.* v. *State Dep't of Transp.*, 266 P.3d 671, 687 (Utah 2011), *abrogated on other grounds by Mounteer Enters., Inc.* v. *Homeowners Ass'n for the Colony at White Pine Canyon*, 422 P.3d 809 (Utah 2018)). We focus on the Operating Agreement, which states White's guaranty "is an irrevocable and unconditional promise[] to pay and not a guarantee of the Company's performance." RVIII.895. This promise is plainly

51

*unconditional*, so its performance was due immediately. That is decisive, as both the bankruptcy court and the BAP determined.

The Trustee attempts to explain away this "irrevocable and unconditional" language, suggesting the guaranty would become unconditional only after the asserted conditions are met. The contract language offers no support for this reading. What the Trustee frames as a condition is instead a set of instructions for calculating White's liability *in the event* those circumstances occur. That is, "to the extent" ABC lasts twelve months from the first commercial card shipment, White's liability under the guaranty is calculated as the remaining "shortfall." RVIII.895. The Trustee's contrary understanding fails to account for the intent of the parties as captured by the text of the Operating Agreement—to put the risk of ABC's nonperformance on White.

We therefore agree with the bankruptcy court that the full $750,000 guaranty obligation was unconditional. Thus, when White paid $750,000 to reduce that liability to zero, he received perfectly equivalent value. Summary judgment for Wardley was therefore appropriate on the Transfer Claim as well.

## III

We **AFFIRM** the grant of summary judgment to Wardley on the Guaranty and Transfer Claims and the denial of summary judgment to the Trustee on the Guaranty Claim.

24-4033, *Bird v. Wardley* (In re White)

**HARTZ**, J. concurring in part, dissenting in part.

I concur in affirming the denial of the Trustee's motion for summary judgment. But I respectfully dissent from affirmance of the grant of summary judgment to Wardley. My disagreement with the majority opinion stems from my view that a reasonable factfinder, viewing the matter as would a creditor of debtor-in-bankruptcy White, could properly find that Wardley did not provide White with reasonably equivalent value in return for the $750,000 guarantee from White to Wardley. Given the paucity of circuit opinions on the meaning of *reasonably equivalent value*, I fear that the analytic approach taken by the majority opinion will enable bankruptcy debtors to engage in inappropriate speculation to the detriment of creditors.

The pertinent Utah statute, which is similar to many statutes within the United States, renders voidable those transfers made or obligations incurred by a debtor "without receiving a reasonably equivalent value in exchange for the transfer or obligation," if the debtor "was insolvent at the time or became insolvent as a result of the transfer or obligation." Utah Code Ann. § 25–6–203(1). In this case debtor White incurred the obligation of a $750,000 guarantee in return for Wardley's financial support for an incipient business, ABC Club LLC. Was the value of that support reasonably equivalent to $750,000?

To answer that question, one needs to put the analysis in context. I agree with the majority opinion that value "'is determined from a creditor's viewpoint and [in] accordance with the purpose of the fraudulent transfer laws, namely, to protect the

debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors.'" Maj. Op. at 40 (quoting Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning and Exemptions* § 2:17 (2024)). Creditors do not necessarily share the same perspective as the debtor on the value of an expenditure (investment) by the debtor. In measuring value, a reasonable person considers the risks and the rewards. But both the risks and the rewards may be rather different for the debtor and a creditor.

This difference in perspective is particularly important in the present context. Reasonable equivalence is irrelevant unless White had been or became insolvent when he made the guarantee. After all, under the Utah statute reasonable equivalence must be assessed only if the investment was made when the debtor was insolvent or would become insolvent upon buying the investment. *See* Utah Code Ann. § 25-6-203(1). In other words, we care about reasonable equivalence only if after the guarantee, White did not have enough assets to pay off his liabilities. His net worth was zero. Given the protection afforded by the bankruptcy laws, White's financial position would become no worse if ABC turned out to be a total failure. He would still be left with just his bankruptcy-exempt assets.  In other words, White had no financial skin in the game; he would lose only the opportunity cost of putting his time and labor into ABC (he could have found another job and earned income that way). But if ABC turned out to be a great success, White could become rich and take care of all his creditors. Thus, White's risks are quite low and his potential gain is quite high. The main financial reason for White not to try to make a go of ABC would be if he thought he had a better alternative investment—such as playing the craps tables.

2

From the perspective of White's creditors, however, the balance of the pros and cons could be quite different. White had some assets (such as a portion of a Missouri judgment, apparently worth more than $750,000), so the creditors could expect at least a partial return on the debt owed. But if ABC fails and White must pay in whole or in part on the $750,000 guarantee, then there will be less available to pay off the other creditors. On the other hand, if ABC is a huge success, the creditors may get back everything they are owed, but they would not otherwise share in the new prosperity of White.

To be sure, it may well be in the interest of creditors to, in essence, invest $750,000 in ABC, if the chance of success of the enterprise is sufficiently high. *See Mellon Bank, N.A. v. Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 151 (3d Cir. 1996) ("Presumably the creditors whom [fraudulent-transfer laws were] designed to protect want a debtor to take *some* risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code."). But a very risky investment may be a bad move. *See id.* at 153–54 (affirming decision by bankruptcy court that investment was too risky to provide reasonably equivalent value). From the point of view of creditors, whether the investment in ABC is reasonably equivalent in value to the $750,000 guarantee depends on whether, at the time of the investment, the investment looks like a good idea. If every reasonable creditor would think the investment is a good idea, then summary judgment should be granted in favor of Wardley on the ground that White received reasonably equivalent value for the guarantee. If every reasonable creditor would think the investment is a bad

3

idea, then summary judgment should be granted against Wardley. If reasonable creditors could differ on the issue, the reasonably-equivalent-value issue is left for a fact-finder.

The majority opinion holds that any reasonable factfinder would determine that White got reasonably equivalent value for his guaranty. I beg to differ. A general creditor could have serious doubts about the opinion's analysis of value.

To begin with, ABC was a one-man show whose success would depend on the skill of White. White had engaged in similar ventures. That gave him some experience. But there is evidence in the record that those prior companies had suffered high losses and needed capital. I am puzzled by the statement in the majority opinion, adopting the opinion of the bankruptcy court, that "ABC assumed none of those prior businesses' debts, so facts related to those prior businesses are untethered from the issue of what property interests the Debtor received and the value of such property resulting from the Guaranty." Maj. Op. at 33 (brackets and internal quotation marks omitted). Is it really true that those thinking about investing in a new business should not consider the prior failures of the entrepreneur when assessing the likelihood of success of that new business? I would think it would be a very important factor.

Another indication that ABC was an iffy proposition is the conduct of Wardley himself. The record shows that he rejected a proposition to invest in the ordinary manner. He declined to invest capital in a White company. And he provided funding of $750,000 only on condition that he receive an ironclad guarantee that he would not lose any of that money. The $750,000 was secured by White's interest in a $15.5 million judgment against a government entity. I would have thought that Wardley's refusal to invest in ABC

4

unless the investment was risk-free shows his doubts about its prospects. (The majority opinion notes that months later Wardley increased his contribution above $750,000, suggesting his confidence in the venture. But, as that opinion elsewhere repeatedly emphasizes, the only relevant time for measuring reasonable equivalence is the time when the guarantee was given. Moreover, we know nothing about the circumstances surrounding later contributions, such as what White told Wardley at the time.)

The majority opinion repeatedly relies on language in ABC's operating agreement stating that White and Wardley anticipated that ABC would make profits sufficient to cover the guarantee. Of course they would say that. I can see no purpose in making such statements except to protect against a fraudulent-transfer challenge. They have virtually no probative value. Worse, the majority opinion would encourage such language in every highly speculative transaction, providing a safe harbor against a claim that the transaction amounted to a constructive fraud of creditors.

I also question the analysis in the majority opinion that goes through all the benefits that White would gain in return for the guarantee. I do not think that adds much, if anything. All those benefits depend on the success of ABC. For example, the majority opinion talks about the advantage to White of the salary he would receive. *See* Maj. Op. at 39–42. But if ABC does not succeed and White has to pay on the guarantee, he would simply be paying back the salary he received. If he had taken another job, he would get to keep his salary, which could be substantially beneficial to creditors.

Because a reasonable person, viewing the matter through the eyes of a creditor, could well decide that White did not receive reasonably equivalent value for his

guarantee, I would set aside the summary judgment in favor of Wardley and remand the issue for trial.